MARK FERRARIO
California Bar No. 104062
TYLER R. ANDREWS
California Bar No. 250686
GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002
ferrariom@gtlaw.com
andrewst@gtlaw.com
*Counsel for Defendant SHAC, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

JOHN LUNA, individually and on behalf of all others similarly situated,

Plaintiffs,

*vs.*

SHAC, LLC dba SAPPHIRE GENTLEMEN'S CLUB, a Nevada corporation,

Defendant.

Case No.5:14-cv-00607-HRL

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Date: Tuesday May 13, 2014

Time: 10:00 a.m.

Dept.: Courtroom 2, 5th Floor

Judge: Honorable Howard R. Lloyd

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff John Luna's ("Plaintiff") Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss ("Opposition") fails to establish that Defendant SHAC, LLC dba SAPPHIRE GENTLEMEN'S CLUB ("SHAC") is subject to personal jurisdiction in California. Notably, Plaintiff does not argue that SHAC is subject to general personal jurisdiction – a tacit admission that SHAC lacks systematic and continuous contacts with California. The Opposition also fails to demonstrate this Court's specific personal jurisdiction over SHAC because even if Plaintiff's alleged harm occurred within the State of California, SHAC does not have any actual knowledge of the location of text message recipients. SHAC's sworn affidavit supports this lack of actual knowledge, and Plaintiff has submitted no evidence to the contrary. Accordingly, SHAC's Motion to Dismiss should be granted.

In the alternative, this Court should transfer this case to the District of Nevada, as Plaintiff has also failed to submit any evidence rebutting SHAC's duly-authenticated evidence that (1) all information and data conceivably relevant to this matter exists solely in Nevada; (2) each potential witness in support of SHAC's defense resides in Nevada; and (3) the cost of litigation in California renders Nevada a much more appropriate forum for this dispute.

## II. LEGAL ARGUMENT

### A. Plaintiff has not met his burden of proving that SHAC is subject to personal jurisdiction in California.

SHAC is not subject to general personal jurisdiction in California, which Plaintiff's Opposition essentially concedes. SHAC presents undisputed evidence that it does not conduct any business, own any property, hold any bank accounts, or engage in any advertising in California. *See* Affidavit of Peter Feinstein at ¶¶5-10 (Doc. No. 10-1). As such, the only potential basis for haling SHAC into this forum is specific personal jurisdiction.

However, Plaintiff's specific personal jurisdiction argument fares no better. As a threshold issue, SHAC's Motion to Dismiss required Plaintiff to "to come forward with facts, by

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

affidavit or otherwise, supporting personal jurisdiction." *Amba Marketing Sys., Inc. v. Jobar Int'l, Inc.,* 551 F.2d 784, 787 (9th Cir.1977 ). Plaintiff's declarations in support of his Opposition – which are substantially similar to the allegations in his Complaint – fail to refute the authenticated evidence in SHAC's supporting affidavit. Put simply, other than stating facts regarding the domicile of Plaintiff, the Opposition does not demonstrate the inaccuracy of SHAC's arguments or asserted facts. Thus, Plaintiff's Opposition does not satisfy Plaintiff's burden of factually establishing SHAC's personal jurisdiction in California. *Chem Lab Products, Inc. v. Stepanek,* 554 F.2d 371, 372 (9th Cir.1977) ("The mere allegations of a complaint, when contradicted by affidavits, are not enough to confer personal jurisdiction over a non-resident defendant").

In order to get around this evidentiary shortfall, Plaintiff's Opposition refers to SHAC's California registered agent, and implies that its mere authorization to conduct business within the state is adequate to confer jurisdiction in this case. This detour is unpersuasive. California law is clear: the appointment of a resident agent does not equate to consent to personal jurisdiction in California. *See, e.g., DVI, Inc. v. Superior Court,* 104 Cal.App. 4th 1080, 1095 (2002) (finding no personal jurisdiction even though the defendant company registered to do business in California, maintained a California agent for service of process, and had two officers residing in California); *Gray Line Tours v. Reynolds Electrical & Engineering Co.,* 193 Cal.App.3d 190, 193-95 (1987) (holding that designation of an agent for service of process and qualification to do business in California alone do not constitute grounds for general jurisdiction). Plaintiff's reliance on a single registered agent address, without any evidence that SHAC *actually conducts business* in California, is not enough to defeat SHAC's jurisdictional challenge. To the contrary, as Plaintiff admits, specific personal jurisdiction requires that the defendant "purposefully direct … some transaction with the forum" and that the claim at issue "relates to the forum-related activities." *See* Opp. at p. 6.

/ / /

/ / /

/ / /

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

**B. Plaintiff has not established this Court's specific personal jurisdiction over SHAC because Plaintiff has not presented any evidence showing that SHAC actually knew that Plaintiff resided in California.**

Plaintiff admits that his specific jurisdiction argument requires the Defendant to know that Plaintiff is a resident of California. *See* Opposition at 13:14-20 (Doc. No. 15). Plaintiff's Opposition also cites to several cases involving phone calls sent to land-line telephones, fax machines, and other instances where the defendants knew the plaintiffs were residents of the forum states. *See* Opposition at 17:3-26 (Doc. No. 15). But Plaintiff presents no evidence showing that SHAC has any knowledge of the forum states of any persons who allegedly received text messages disseminated from SHAC's static database of customers.[1] Accordingly, this Court must accept SHAC's evidence that "SHAC lacks any direct knowledge of the forum states of any persons in the database which may have allegedly received text messages." *See* Affidavit of Peter Feinstein at ¶11 (Doc. No. 10-1). Without SHAC knowing Plaintiff resided in California, Plaintiff cannot establish California's specific personal jurisdiction over SHAC. *See* *Davis v. NIH Fed. Credit Union*, 12-CV-05502-JCS, 2013 WL 2147468 (N.D. Cal. May 15, 2013), citing *Peterson v. Kennedy,* 771 F.2d 1244, 1262 (1985) ("ordinarily use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the forum state").

Further, the cases relied upon in Plaintiff's Opposition are easily distinguishable. In *Heidorn v. BDD Mktg. & Mgmt. Co., LLC*, plaintiff alleged that defendant took all of his information under the false pretense of offering an insurance quote, contacted him countless times over a six month period despite numerous demands to stop, and sold plaintiff's information to third parties. *Heidorn v. BDD Mktg. & Mgmt. Co., LLC*, C-13-00229 JCS, 2013 WL 6571629 (N.D. Cal. Aug. 19, 2013) *report and recommendation adopted*, 13-CV-00229-YGR,

---

[1] Plaintiff's Opposition claims that both Plaintiff and third-party Sunil Daniel received between seven and nine text messages from SHAC. *See* Opposition 10:10-22 (Doc. No. 15). But Plaintiff does not submit any evidence whatsoever that SHAC actually knew Plaintiff or Mr. Daniel resided in California.

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

2013 WL 6571168 (N.D. Cal. Oct. 9, 2013). Plaintiff also relies on *j2 Global Communications, Inc. v. Blue Jay, Inc.*, where the defendant hired a company to send over 500,000 unsolicited fax advertisements to fax machines located all over the country, including a specific California-based fax machine. 2009 WL 29905, at *10 (N.D.Cal., Jan. 05, 2009). Specific personal jurisdiction in both of these cases was premised on the defendants' actual knowledge of the plaintiffs' domiciles. Specifically, the *Heidorn* defendant actually collected the plaintiff's complete personal information and address, and the *Blue Jay* defendant sent numbers to a landline-connected, California-based, fax machine.

In the instant case, however, SHAC submitted unrefuted evidence that it *lacked* actual knowledge of Plaintiff's forum state. Plaintiff's only argument in response is that Plaintiff's California domicile "should have been obvious" to SHAC based on Plaintiff's "California-specific" area code. *See* Opposition at 13:20-27. This argument holds no merit. First, there is no such thing as "California-specific" area code for a cellular phone. Indeed, the Pew Research Center, who has extensively studied the complications of matching cell phone numbers to geographic locations, notes:

> "Because cell phones are not wired to a particular location, the number associated with that phone does not have the same meaning geographically that it has for landline phones. The area code and exchange associated with a landline telephone number allows it to be located fairly precisely. However, **there is no requirement that wireless phones numbers be associated with a particular address or even with a particular geographic area**."[2] [3]

The State of Nevada (and particularly the city of Las Vegas) is extremely transient, with tens thousands of relocating residents moving to the State each year. Indeed, over 200,000

---

[2] *See* Pew Research Center Article, attached hereto as **Exhibit 1**.

[3] The articles and studies attached to this Reply are subject to judicial notice pursuant to Fed. R. Evid. 201. Courts may take judicial notice of material "not subject to reasonable dispute [and] ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *Daniels-Hall v. National Educ. Ass'n*, 629 F. 3d 992 (9th Cir. 2010) (judicial notice proper where online content "was made publicly available by government entities"); *County of Santa Clara v. Astra USA, Inc.*, 401 F.Supp.2d 1022, 1024 (N.D.Cal.2005) (taking judicial notice of public data posted online).

California residents have migrated to Nevada from 2000-2010.[4] As many residents decide not to change their existing phone numbers, one way these incoming moves are tracked and analyzed is to study the out-of-state area codes of their mobile devices. In fact, **the top 8 out-of-state area codes for Las Vegas residents are all from California cities.**[5] Los Angeles and San Jose – Mr. Sunil's and Plaintiff's cities of residence – are first and seventh on this list, respectively.[6] Thus, far from being "obvious," as Plaintiff brazenly asserts, there is no possible way for SHAC – or any Nevada entity – to determine a customer's state of residence based on a mobile area code. Indeed, it would be impossible for SHAC to know that Plaintiff resides in California -- even accepting all operative facts in the Complaint and Opposition as true. This fact alone defeats the Opposition's primary argument, and defeats any claim for specific jurisdiction over SHAC in the State of California.

Further, it would be unreasonable to subject SHAC to specific jurisdiction where it has no business contacts with California, and while all documents, electronic data, witnesses, and other tangible information or evidence relating in any way Plaintiff's allegations are located within the State of Nevada. Other than offering opinion and conjecture, Plaintiff's Opposition fails to provide any actual evidence or information to refute SHAC's position that (1) it has no sufficient contacts in California to justify jurisdiction within the state, and (2) that *Plaintiff himself initiated contact with SHAC in the State of Nevada*. Therefore, subjecting SHAC to jurisdiction in this forum would offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945); *see also Tankersley v. Lynch*, 2011 WL 1770304, *4 (N.D. Cal. 2011) (finding exercise of personal jurisdiction unreasonable "given the minimal extent to which Defendants have injected themselves into California (if at all) and the greater judicial efficiency of having the matter heard in the state where the majority of parties and potential witnesses are located").

---

[4] *See* Manhattan Institute Article Studying California Migration Policies, attached hereto as **Exhibit 2**, 7-8.

[5] *See* Las Vegas Review Journal Article about Las Vegas Residents' Out-of-State Cell Phone Area Codes, attached hereto as **Exhibit 3**.

[6] *Id.*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

SHAC, a Nevada-based business which was first contacted by Plaintiff *in Nevada*, and which has no ability to match customer cell phone numbers with a physical residence or state of domicile, could not possibly foresee being hauled into a California court under these circumstances. At a minimum, SHAC has clearly not purposefully availed itself of the benefits or protections of California law. Thus, exercising personal jurisdiction over SHAC would violate California's due process requirements, and SHAC's Motion to Dismiss should be granted.

**C. IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER VENUE TO THE DISTRICT OF NEVADA.**

Even assuming this Court could maintain personal jurisdiction over SHAC, the case should nonetheless be transferred to the District of Nevada. Plaintiff does not refute SHAC's evidence that "[a]ll documents, electronic data, witnesses, and other tangible information" related to Plaintiff's claims are located in Nevada, not in the State of California. *See* Affidavit of Peter Feinstein at ¶12 (Doc. No. 10-1). Moreover, Plaintiff submits no evidence refuting SHAC's evidence that "[i]t would be extremely cost-prohibitive for SHAC to litigate this dispute in California, where it has no witnesses and no active business contacts." *See* Affidavit of Peter Feinstein at ¶14 (Doc. No. 10-1).

Rather than presenting its own evidence opposing SHAC's request to transfer venue, Plaintiff's Opposition merely wags its finger at SHAC's brevity regarding the merits of transferring this case to Nevada. *See* Opposition at 13:10-13 (Doc. No. 15). But few words are needed to show that (1) Nevada, unlike California, clearly has personal jurisdiction over SHAC and possession of all physical evidence at issue; (2) it would pose extreme inconvenience and cost for SHAC to defend this litigation in California; and (3) the injustice of forcing SHAC to defend this case in California under these circumstances outweighs Plaintiff's desire to try this case on "home turf." Further, Plaintiff's conclusory claim that Nevada somehow "lacks interest" in a case involving a Nevada-based entity is unpersuasive, and should hold little weight in this Court's analysis. If anything, Plaintiff's tangential analysis of docket congestion between Districts is relatively equivalent, and provides no basis for overlooking the much

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

more prevalent factors justifying transfer. Accordingly, if this case is not dismissed for a lack of personal jurisdiction over SHAC, this case should be transferred to the District of Nevada.

## III. CONCLUSION

In light of the foregoing, Defendant respectfully requests that this action be dismissed for lack of personal jurisdiction. In the alternative, Defendant respectfully requests that this action be transferred to the District of Nevada.

Dated this 28th day of April, 2014.

GREENBERG TRAURIG, LLP

By: */s/ Tyler R. Andrews*

MARK E. FERRARIO
California Bar No. 104062
TYLER R. ANDREWS
California Bar No. 250686
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

VERA RANIERI
California Bar No. 271594
GREENBERG TRAURIG, LLP
4 Embarcadero Center
Suite 3000
San Francisco, CA 94111
Telephone: (415) 655-1259
Facsimile: (415) 707-2010
ranieriv@gtlaw.com

*Counsel for Defendant SHAC, LLC*

GREENBERG TRAURIG, LLP
3773 Howard Hughes Parkway
Suite 500 North
Las Vegas, Nevada 89169
Telephone: (702) 792-3773
Facsimile: (702) 792-9002

# EXHIBIT 1

PewResearchCenter

JULY 9, 2009

# Accurately Locating Where Wireless Respondents Live Requires More Than A Phone Number

by Leah Christian, Michael Dimock and Scott Keeter

*The following commentary is based on a presentation at the Annual Meeting of the American Association for Public Opinion Research, Hollywood, Florida, May 14-17, 2009*

As the number of adults reachable only by cell phone continues to grow, more telephone surveys are including cell phone samples to ensure that their results are representative of the U.S. population. One issue of particular concern in surveys that include cell phones is the accuracy of geographic information that is derived from cell phone numbers; this information that accompanies the sample is used by many surveyors for geographic sampling and analysis. Being able to identify the location of respondents with precision is important for accurately sampling people in particular areas and for analyzing local and regional differences in respondents' attitudes and behaviors. This problem is exacerbated by the fact that the wireless-only are more geographically mobile than those with landline phones.

There are several differences in the geographic information provided with landline and cell phone numbers. Because cell phones are not wired to a particular location, the number associated with that phone does not have the same meaning geographically that it has for landline phones. The area code and exchange associated with a landline telephone number allows it to be located fairly precisely. However, there is no requirement that wireless phones numbers be associated with a particular address or even with a particular geographic area. Even if someone chooses a number "near" the area where they live or work, the service areas for wireless phones can be larger than those for landline phones so accurately locating someone is much more difficult. And, of course, people may obtain a telephone in one location and move to an entirely different location while retaining the phone number.

To assess the accuracy of the geographic information provided with wireless telephone samples, we test whether the sample information matches geographic data derived from respondents' self-reported zip code at the regional, state and county level and compare the results to those for the landline sample frame. The data for this analysis come from six general population surveys conducted in the Fall of 2008. The combined dataset includes 10,430 landline respondents and 3,460 cell respondents, including 1,160 cell phone only respondents. This design allows us to test the validity of geographic information from landline and cell phone samples simultaneously and to analyze the accuracy of the information for different types of cell respondents (cell only, cell mostly,

and others who use their cell phones less frequently). We also use data from a survey focused on geographic mobility to evaluate whether types of phone-use groups differ in their patterns of mobility.

## Geographic Information Less Accurate in Cell Sample

The geographic information derived from cell phone numbers is subject to a great deal of error, and the size of the error increases as the geographic unit of analysis gets smaller. For geographic analysis at the regional level (e.g., Northeast, South, Midwest, West), the geographic data associated with the cell sample is fairly accurate; the sample and zip code-derived region match for 94% of cell phone respondents while only 4% do not match (in 1% of the cases the zip code was missing or could not be matched.)

Error rates increase when moving to the state level. State codes associated with the original sample differ from the state of the respondent-provided zip code for 9% of the respondents. Looked at another way, this means that in a sample of cell phone numbers for a particular state, on average about 9% of potential respondents who live in that state will not be included in the sampling frame, and the amount of error can vary from state to state.

**How Accurate is Geographic Information Provided with Sample?**

| | Landline sample | Cell sample |
|---|---|---|
| *Census region* | % | % |
| Sample and zip match | 98 | 94 |
| Sample and zip don't match | * | 4 |
| Missing/unmatched zip | 2 | 1 |
| *State* | | |
| Sample and zip match | 97 | 90 |
| Sample and zip don't match | 1 | 9 |
| Missing/unmatched zip | 2 | 1 |
| *County* | | |
| Sample and zip match | 92 | 59 |
| Sample and zip don't match | 7 | 39 |
| Missing/unmatched zip | 2 | 1 |

Figures read down.
Based on weighted data from surveys conducted 9/9-11/1/2008.

The amount of error is larger at the county level of analysis.[1] (#en1) The sample and zip code-derived county do not match for nearly four-in-ten cell respondents (39%).

In the landline sample, the size of the error is considerably smaller. At the regional and state level, the sample and zip code information differ for 1% or less of the landline respondents. This increases to 7% at the county level. In 2% of the cases, the respondent did not provide a zip code or it could not be matched.

## Is Geographic Information Less Accurate for Particular Groups?

While geographic assignment from cell phone numbers is inherently difficult, error rates are even higher when looking at respondents who are "cell only," meaning they have no landline telephone in their home. Within this group – roughly 20% of the adult population according to the latest National Health Interview Survey estimates — 6% are not matched at the regional level, 12% at the state level and 43% at the county level. The percent not matched is lower, though still widespread, for adults with landline and cell phones. In the landline sample, the size of the error does not vary substantially across phone use groups and is much smaller than in the cell sample.

**Slight Differences Among Phone Use Groups**

| *Percent where sample and zip code do not match within …* | Census region % | State % | County % | n |
|---|---|---|---|---|
| ***Cell sample*** | | | | |
| Cell phone only | 6 | 12 | 43 | 1160 |
| Wireless mostly | 3 | 8 | 38 | 825 |
| Landline mostly or mixed* | 2 | 5 | 36 | 1426 |
| ***Landline sample*** | | | | |
| Wireless mostly | * | 1 | 9 | 1524 |
| Landline mostly or mixed* | * | 1 | 6 | 6455 |
| Landline only | 1 | 2 | 7 | 2286 |

Figures read across.
*People with both landline and cell phones who receive none, few or some calls on their cell phone

Overall, there are only slight differences among various demographic groups in the accuracy of the geographic information provided with the cell sample. A slightly greater share of men than women live in a different location than the sample information derived from their cell phone number would suggest. More young people are not matched than those who are age 50 and older. More whites than blacks live in a zip code that is different from the geographic information provided with the sample. Also, more college graduates than those with a high school education or less live in an area different from their cell phone number.

There are also differences by region. The size of the error is smallest in the West where counties and states are larger and the population is more dispersed; only 7% do not match at the state level and 27% at the county level in this region. However, in the Northeast where densities are greater and states and counties are often smaller, as many as 12% do not live in the state the sample would suggest and nearly half (45%) do not live in the county associated with their cell phone number.

**Differences Among Demographic Groups**

| *Percent where sample and zip code do not match among …* | Census region % | State % | County % | n |
|---|---|---|---|---|
| Men | 5 | 10 | 41 | 1879 |
| Women | 4 | 8 | 37 | 1581 |
| 18-29 | 6 | 13 | 44 | 1039 |
| 30-49 | 4 | 7 | 39 | 1232 |
| 50+ | 3 | 5 | 32 | 1159 |
| White, non-Hispanic | 5 | 10 | 42 | 2330 |
| Black, non-Hispanic | 2 | 6 | 34 | 488 |
| College grad+ | 6 | 10 | 45 | 1270 |
| Some college | 4 | 10 | 42 | 1030 |
| High school or less | 4 | 7 | 35 | 1150 |
| Northeast | 6 | 12 | 45 | 559 |
| Midwest | 4 | 10 | 42 | 846 |
| South | 5 | 9 | 44 | 1332 |
| West | 4 | 7 | 27 | 688 |

Figures read across.
Based on respondents from the cell sample.

## Mobility and Phone Usage Patterns

Underlying some of the inaccuracies in geographic information for the cell sample are variations in mobility patterns among different phone use groups. More people who have only a landline phone have lived their entire life in the same community (43%) than is the case for Americans with both a landline and cell or only a cell phone. More cell-only have moved within the same state (31%) than those in other groups, whereas more dual users with both a landline and cell phone (both wireless mostly and those who use their cell phones less often) have moved across state lines.

The landline-only have also lived in their communities longer than people with a cell phone; they have lived in their community for more than 20 years on average, nearly twice as long as the cell mostly (11 years) and cell-only groups (9 years). Significantly more cell-only (33%) and cell-mostly duals (22%) have lived in their current location for less than 5 years compared with only 14% of the other dual users and 10% of the landline only. On the other end of the spectrum, significantly more of the landline-only and duals who use their cell phones less often have lived in their communities for 20 or more years.

**Cell Only and Cell Mostly More Likely to Move**

| | Total | Landline only | Other duals | Cell mostly | Cell only |
|---|---|---|---|---|---|
| ***Live entire life in same community?*** | % | % | % | % | % |
| Yes | 35 | 43 | 33 | 36 | 32 |
| No, moved | 65 | 56 | 66 | 63 | 68 |
| *Within same state* | *22* | *23* | *20* | *18* | *31* |
| *Different state(s)* | *43* | *33* | *46* | *45* | *37* |
| ***How long lived in community?*** | | | | | |
| 0-4 years | 18 | 10 | 14 | 22 | 33 |
| 5-9 years | 10 | 9 | 10 | 12 | 12 |
| 10-19 years | 15 | 13 | 17 | 15 | 12 |
| 20+ years | 21 | 25 | 26 | 14 | 11 |
| Entire life | 35 | 43 | 33 | 36 | 32 |
| Mean | 15.4 | 20.4 | 17.3 | 11.3 | 9.2 |
| Median | 10.0 | 15.0 | 14.0 | 8.0 | 5.0 |
| ***Plan to move in next 5 years*** | | | | | |
| Very likely | 20 | 13 | 15 | 27 | 32 |
| Somewhat likely | 20 | 16 | 19 | 24 | 23 |
| Not too likely | 24 | 20 | 27 | 21 | 21 |
| Not at all likely | 34 | 44 | 37 | 26 | 22 |
| Will not move | 1 | 5 | 1 | 1 | * |
| N | 2260 | 366 | 1177 | 426 | 265 |

Figures based on weighted data from survey conducted Oct. 3-19, 2008.

Although there are no differences among the dual users in past moving behavior, significantly more people who use their cell phones for nearly all of their calls say they are very likely to move in the next five years (27%) than do those who use their cell phones less frequently (15%). Nearly a third (32%) of the cell-only are very likely to move in the near future. In contrast, 44% of the landline-only and 37% of the more landline dominant duals say they are not at all likely to move in the next five years.

These differences may also reflect demographic differences in mobility patterns (see Who Moves? Who Stays Put? Where's Home? (http://pewsocialtrends.org/pubs/721/movers-and-stayers) for a more detailed report of the results from this survey).

## Implications for Sampling and Data Analysis

The mobile nature of wireless phones creates a significant problem for geographic sampling, particularly as the size of the area being surveyed gets smaller. Because numbers are not associated with physical addresses, there can be a large amount of error in the geographic information associated with cell phone numbers. To address this issue, respondents who do not live in the area may be identified and screened out of the survey, but people who live in the area but have cell phone numbers from a different area will not be covered in the sampling frame. The size of the error is relatively small at the regional and state level but compromises the ability to accurately sample smaller geographic areas.

For sampling within cities, counties or other more narrow geographic areas, surveyors should consider other alternatives to random digit dialing (RDD). Address-based sampling allows surveyors to locate respondents with a great deal of accuracy and can provide even more possibilities for

sampling at small geographic areas than telephone surveys can. Several studies (#fn2) [2] (#en2) have documented how address-based sampling can cover the wireless-only population and provide at least comparable results to those gained from RDD telephone surveys.

Because there can be a significant amount of error associated with the geographic information provided with the sample, surveyors wishing to conduct geographic data analysis should explore other alternatives. Information can be collected from respondents to replace or at least supplement that provided with the sample. It is important to collect information at the appropriate level of precision for the desired analysis. Various types of external sources can be used to supplement information provided by respondents and reduce the number of questions needed. The Pew Research Center is now using respondents' self-reported zip code and matching it to an external source to derive appropriate geographic information so that our analyses can be more accurate. Because there is still some error in the geographic information for landline respondents, we are using this approach for both landline and cell respondents in all of our dual frame surveys.

---

1. For the purposes of this analysis, we assume that respondents are able to provide an accurate zip code, and that when data do not match, it represents errors in the information derived from the telephone number. Postal service zip codes do not cross state lines, and therefore should provide an accurate assessment of the respondent's location. Neither zip codes nor telephone prefixes align perfectly with county boundaries however, so there is a certain amount of error in accurately placing a respondent in a county using either approach. For the purposes of this analysis, we assume that the zip code provides the more accurate assignment, given that zip codes are typically smaller geographic areas than telephone prefix areas, especially when it comes to wireless telephone numbers.

2. Link, et al. 2008. "A Comparison of Address-Based Sampling (ABS) Versus Random Digit Dialing (RDD) for General Population Surveys". Public Opinion Quarterly 72:6-27. Fleeman and Wasikowski. 2009. "Performance Rates of CPO Subsequent Survey Households Identified Via Address Frames."; Link, et al. 2009. "Building a New Foundation: Transitioning to Address Based Sampling after Nearly 30 Years of RDD."; and Sherr, et al. 2009. "Comparing Random Digit Dial and United States Postal Service Address-Based Sample Designs for a General Population Survey: The 2008 Massachusetts Health Insurance Survey." presented at the Annual Meeting of the American Association for Public Opinion Research.

# EXHIBIT 2

MANHATTAN INSTITUTE FOR POLICY RESEARCH

search go

HOME ABOUT MI CENTERS ISSUES CITY JOURNAL EXPERTS PUBLICATIONS MULTIMEDIA EVENTS SUPPORTING MI

Civic Report

No. 71 September 2012

# THE GREAT CALIFORNIA EXODUS:
# A Closer Look

**Tom Gray & Robert Scardamalia**

## Executive Summary

For decades after World War II, California was a destination for Americans in search of a better life. In many people's minds, it was the state with more jobs, more space, more sunlight, and more opportunity. They voted with their feet, and California grew spectacularly (its population increased by 137 percent between 1960 and 2010). However, this golden age of migration into the state is over. For the past two decades, California has been sending more people to other American states than it receives from them. Since 1990, the state has lost nearly 3.4 million residents through this migration.

This study describes the great ongoing California exodus, using data from the Census, the Internal Revenue Service, the state's Department of Finance, the Bureau of Labor Statistics, the Federal Housing Finance Agency, and other sources. We map in detail where in California the migrants come from, and where they go when they leave the state. We then analyze the data to determine the likely causes of California's decline and the lessons that its decline holds for other states.

The data show a pattern of movement over the past decade from California mainly to states in the western and southern U.S.: Texas, Nevada, and Arizona, in that order, are the top magnet states. Oregon, Washington, Colorado, Idaho, and Utah follow. Rounding out the top ten are two southern states: Georgia and South Carolina.

A finer-grained regional analysis reveals that the main current of migration out of California in the past decade has flowed eastward across the Colorado River, reversing the storied passages of the Dust Bowl era. Southern California had about 55 percent of the state's population in 2000 but accounted for about 65 percent of the net out-migration in the decade that followed. More than 70 percent of the state's net migration to Texas came from California's south.

What has caused California's transformation from a "pull in" to a "push out" state? The data have revealed several crucial drivers. One is chronic economic adversity (in most years, California unemployment is above the national average). Another is density: the Los Angeles and Orange County region now has a population density of 6,999.3 per square mile—well ahead of New York or Chicago. Dense coastal areas are a source of internal migration, as people seek more space in California's interior, as well as migration to other states. A third factor is state and local governments' constant fiscal instability, which sends at least two discouraging messages to businesses and individuals. One is that they cannot count on state and local governments to provide essential services—much less, tax breaks or other incentives. Second, chronically out-of-balance budgets can be seen as tax hikes waiting to happen.

The data also reveal the motives that drive individuals and businesses to leave California. One of these, of course, is work. States with low unemployment rates, such as Texas, are drawing people from California, whose rate is above the national average. Taxation also appears to be a factor, especially as it contributes to the business climate and, in turn, jobs. Most of the destination states favored by Californians have lower taxes. States that have gained the most at California's expense are rated as having better business climates. The data suggest that many cost drivers—taxes, regulations, the high price of housing and commercial real estate, costly electricity, union power, and high labor costs—are prompting businesses to locate outside California, thus helping to drive the exodus.

Population change, along with the migration patterns that shape it, are important indicators of fiscal and political health. Migration choices reveal an important truth: some states understand how to get richer, while others seem to have lost the touch. California is a state in the latter group, but it can be put back on track. All it takes is the political will.

## About the Authors

TOM GRAY is an award-winning editor, writer, and communications consultant whose work has covered a wide range of fields, including investor relations, personal finance, health care, engineering, leading-edge scientific research, and

CSLL CENTER FOR STATE AND LOCAL LEADERSHIP AT THE MANHATTAN INSTITUTE



EMAIL THIS | PRINTER FRIENDLY

DOWNLOAD PDF

Like 1.5k Tweet 717
g+1 24 800

PRESS RELEASE

PODCAST

OP-ED

California's New Migrants Following the Work, Tom Gray, Union-Tribune San Diego, 10-7-12

Toxic State Syndrome: As California Declines, Texas Rises, Tom Gray, The Daily Beast, 9-30-12

Jerry Brown's tax-hike hail mary, Ben Boychuk, New York Post, 10-1-12

IN THE NEWS

Business flight ignites political battle, Union-Tribune San Diego, 2-8-14

Jerry Brown's Logic, The Wall Street Journal, 11-8-13

Where have all the children gone?, Stockton Record, 3-11-13

California is back — or so we're told, Orange County Register, 2-

fields, including investor relations, personal finance, health care, engineering, leading-edge scientific research, and local, state, and national politics. In a career spanning four decades, he has written for publications such as the Los Angeles Times, City Journal, and Investor's Business Daily (where he also served as senior editor), and has authored three books on online investing published by John Wiley & Sons. As editorial-page editor of the Los Angeles Daily News, Gray won a number of awards for writing and editing including first place awards for editorial writing from the California Newspaper Publishers Association and the Inland Daily Press Association. He also has provided marketing and communications services for business and not-for-profit clients including Deloitte & Touche, ValueOptions Inc., the Kavli Foundation, the Synthetic Biology Institute at the University of California, Berkeley, and the University of California, Santa Barbara. A graduate with distinction from Stanford University, Gray also has master's degrees in English and business administration. He lives in Cambria, California.

ROBERT SCARDAMALIA is president of RLS Demographics, Inc., a firm specializing in the use and analysis of economic and demographic data for private and public applications, and a data consultant for the Manhattan Institute's Empire Center for New York State Policy. He was formerly director of the Center for Research and Information Analysis in the New York State Department of Economic Development and served as chief demographer of the State of New York and director of the State Data Center. Scardamalia is a professional demographer and has more than 30 years of experience using Census and related data for marketing, business attraction, and public sector program management. He holds a bachelor's degree in sociology from Penn State University and a master's degree in demography from Georgetown University.

## Introduction

California was once a powerful draw for Americans on the move—a golden land, "west of the west," in Theodore Roosevelt's famous phrase, where everything could be better. But that California is no more. Around 1990, after decades of spectacular postwar growth, California began sending more people to other states than it got in return. Since that shift, its population has continued to grow (at a rate near the national average) only because of foreign immigration and a relatively high birthrate. Immigration from other nations, though, is declining, and it is likely that the state's growth rate may soon fall behind that of the U.S. as a whole. As a magnet of opportunity, the state now pushes out where it once pulled in.

Chart 1: Percent Change in Population by Decade, U.S. and California, 1890–2010




What are the reasons for this exodus, and what do they tell us about how American states thrive or decline? To understand how California the cherished destination turned into California the place to escape, this study examined data from a number of different sources that have tracked the great exodus of the past 20 years. We draw on the most recent data available from the Census, the Internal Revenue Service, the state's Department of Finance, the Bureau of Labor Statistics, the Federal Housing Finance Agency, and other sources. We have been able to use these sources to describe the exodus in unprecedented detail, revealing its drivers and suggesting things that other states can learn from California's continuing decline.

## Setting the Scene

California is a far more populous state than it was in 1960, when it was second to New York in population size, with 15,717,204 people. Since then, the state has grown 137 percent, to 37,253,956 in 2010. For comparison, consider New York, which grew by only 15 percent during that same period. On the other hand, Texas has grown faster over these 50 years—by 262 percent. As we'll see below, though, it's significant that Texas's record reflects a recent sprint. Until 2000, its growth matched California's rather than surpassing it.

Chart 2 & 3: Changes in California's Population, 1960–2010




28-13
Despite Prop. 30, CA Revenues Could Could Come Up Short, FoxandHoundsdaily.com, 2-5-13
California vs. Texas, Columbia Basin Herald, 2-1-13
Golfers' tax avoidance; California levy on millionaires drives away success, Editorial, The Washington Times, 1-28-13
California's Demographic Dilemma: Where Are The Kids?, Editorial, Investor's Business Daily, 1-18-13
NYT: Time to Start Looking to California for Solutions, NRO's "The Corner", January 10, 2013
California dreamin' in Gruesome Gulch, a view from bottom of 'fiscal cliff', The Washington Times, 1-1-13
New tax increases in California stir debate about adding to exodus, FoxNews.com, 12-22-12
Bust: California named worst-run state in the nation, HotAir.com, 11-29-12
4 lessons from the California exodus, Oregon Business News, 10-25-12
NEW: The evidence still shows California exodus, CalWatchdog.com, 10-24-12
Taxes aren't going to make the rich leave California, report says, Los Angeles Times' "PolitiCal", 10-24-12
Viewpoints: Prop. 30 would hurt state's economic prospects, The Sacramento Bee, 10-6-12
Top Destination States for Jobs, CNBC.com, 10-17-12
California Businesses Are Wimps on High Taxes, BloombergView, 10-16-12
A Modest Proposal, Townhall.com, 10-10-12
Welfare for Hollywood, The Wall Street Journal, 10-6-12
California, here we stay, Los Angeles Daily News, 10-6-12
California Takes 'Business for Granted' -- and It's Leaving, Newsmax.com, 10-6-12
Maybe California's just full, Record-Searchlight, 10-3-12
Californians flee so Brown offers perks for illegals, New York Post, 10-1-12
The Decline of the West, PublicSectorInc.org, 10-1-12
NEW: Crazifornia exodus: People fleeing dense cities, regulations, CalWatchdog, 10-1-12
Who's leaving the state, and why, Orange County Register, 10-1-12
Jerry Brown's Vetoes and the







California's domestic migration peaked before 1990 and then fell sharply, offset only in part by foreign immigration. Natural increase (bottom chart) has also declined

Sources: California Dept. of Finance for population, births and deaths except for July 2010 to July 2011 births and deaths; U.S. Dept. of Homeland Security for foreign immigration, 1960-88; U.S. Bureau of the Census for foreign immigration, 1989-2011; birth and death data for July 2010 to July 2011

Since the watershed year of 1990, California's growth rate has slowed, and is now near the average for the United States as a whole. Moreover, the nature of Californian growth has changed. From 1960 to 1990, more than half of its population increase—54 percent, according to state Department of Finance estimates—was due to migration from other states or foreign countries. In this heyday of California's desirability to migrants, net domestic migration from within the U.S. alone totaled more than 4.2 million, or 30 percent of the overall growth. So in 30 years, California took in enough American migrants to populate the entire state of Missouri.

## Table I: Components of California Population Change, 1960–2011

| | State Dept. of Finance Pop. Estimate | 12-Mo. Change | Births | Deaths | Natural Increase | Foreign | Domestic Migration | Net Migration |
|---|---|---|---|---|---|---|---|---|
| July 1, 1960 | 15,863,000 | | | | | | | |
| July 1, 1961 | 16,412,000 | 549,000 | 381,000 | 137,000 | 244,000 | 64,205 | 240,795 | 305,000 |
| July 1, 1962 | 16,951,000 | 539,000 | 378,000 | 141,000 | 237,000 | 72,675 | 229,325 | 302,000 |
| July 1, 1963 | 17,530,000 | 579,000 | 381,000 | 148,000 | 233,000 | 79,090 | 266,910 | 346,000 |
| July 1, 1964 | 18,026,000 | 496,000 | 375,000 | 151,000 | 224,000 | 67,407 | 204,593 | 272,000 |
| July 1, 1965 | 18,464,000 | 438,000 | 355,000 | 153,000 | 202,000 | 67,671 | 168,329 | 236,000 |
| July 1, 1966 | 18,831,000 | 367,000 | 338,000 | 157,000 | 181,000 | 73,073 | 112,927 | 186,000 |
| July 1, 1967 | 19,175,000 | 344,000 | 337,000 | 157,000 | 180,000 | 69,150 | 94,850 | 164,000 |
| July 1, 1968 | 19,432,000 | 257,000 | 339,000 | 161,000 | 178,000 | 72,371 | 6,629 | 79,000 |
| July 1, 1969 | 19,745,000 | 313,000 | 351,000 | 166,000 | 185,000 | 71,183 | 56,817 | 128,000 |
| July 1, 1970 | 20,039,000 | 294,000 | 358,000 | 165,000 | 193,000 | 74,268 | 26,732 | 101,000 |
| July 1, 1971 | 20,346,000 | 307,000 | 352,000 | 168,000 | 184,000 | 69,825 | 53,175 | 123,000 |
| July 1, 1972 | 20,585,000 | 239,000 | 313,000 | 169,000 | 144,000 | 80,121 | 14,879 | 95,000 |
| July 1, 1973 | 20,869,000 | 284,000 | 303,000 | 173,000 | 130,000 | 84,664 | 69,336 | 154,000 |
| July 1, 1974 | 21,174,000 | 305,000 | 301,000 | 170,000 | 131,000 | 86,699 | 87,301 | 174,000 |
| July 1, 1975 | 21,538,000 | 364,000 | 316,000 | 171,000 | 145,000 | 83,061 | 135,939 | 219,000 |
| July 1, 1976 | 21,936,000 | 398,000 | 323,000 | 170,000 | 153,000 | 113,164 | 131,836 | 245,000 |
| July 1, 1977 | 22,352,000 | 416,000 | 342,000 | 168,000 | 174,000 | 98,401 | 143,599 | 242,000 |
| July 1, 1978 | 22,836,000 | 484,000 | 350,000 | 173,000 | 177,000 | 143,544 | 163,456 | 307,000 |
| July 1, 1979 | 23,257,000 | 421,000 | 368,000 | 177,000 | 191,000 | 99,774 | 130,226 | 230,000 |
| July 1, 1980 | 23,782,000 | 525,000 | 390,000 | 180,000 | 210,000 | 100,769 | 214,231 | 315,000 |
| July 1, 1981 | 24,278,000 | 496,000 | 413,000 | 189,000 | 224,000 | 136,938 | 135,062 | 272,000 |
| July 1, 1982 | 24,805,000 | 527,000 | 425,000 | 186,000 | 239,000 | 138,962 | 149,038 | 288,000 |
| July 1, 1983 | 25,337,000 | 532,000 | 435,000 | 188,000 | 247,000 | 127,312 | 157,688 | 285,000 |
| July 1, 1984 | 25,816,000 | 479,000 | 437,000 | 191,000 | 246,000 | 139,413 | 93,587 | 233,000 |
| July 1, 1985 | 26,403,000 | 587,000 | 457,000 | 202,000 | 255,000 | 154,525 | 177,475 | 332,000 |
| July 1, 1986 | 27,052,000 | 649,000 | 481,000 | 200,000 | 281,000 | 167,896 | 200,104 | 368,000 |
| July 1, 1987 | 27,717,000 | 665,000 | 493,000 | 206,000 | 287,000 | 160,393 | 217,607 | 378,000 |
| July 1, 1988 | 28,393,000 | 676,000 | 517,000 | 214,000 | 303,000 | 187,828 | 185,172 | 373,000 |
| July 1, 1989 | 29,142,000 | 749,000 | 547,000 | 216,000 | 331,000 | 180,930 | 237,070 | 418,000 |
| July 1, 1990 | 29,828,000 | 686,000 | 594,000 | 213,000 | 381,000 | 186,225 | 118,775 | 305,000 |
| July 1, 1991 | 30,459,000 | 631,000 | 609,000 | 213,000 | 396,000 | 194,317 | 40,683 | 235,000 |
| July 1, 1992 | 30,987,000 | 528,000 | 613,000 | 216,000 | 397,000 | 238,281 | -107,281 | 131,000 |
| July 1, 1993 | 31,314,000 | 327,000 | 588,000 | 216,000 | 372,000 | 247,253 | -292,253 | -45,000 |
| July 1, 1994 | 31,524,000 | 210,000 | 579,000 | 223,000 | 356,000 | 205,872 | -351,872 | -146,000 |
| July 1, 1995 | 31,712,000 | 188,000 | 558,000 | 221,000 | 337,000 | 165,315 | -314,315 | -149,000 |
| July 1, 1996 | 31,963,000 | 251,000 | 544,000 | 225,000 | 319,000 | 199,483 | -267,483 | -68,000 |
| July 1, 1997 | 32,453,000 | 490,000 | 531,000 | 222,000 | 309,000 | 201,666 | -20,666 | 181,000 |
| July 1, 1998 | 32,863,000 | 410,000 | 522,000 | 226,000 | 296,000 | 169,541 | -55,541 | 114,000 |

Limits of Progressivism, Reason, 10-1-12
People are fleeing our state, Appeal-Democrat, 9-30-12
Hundreds of Thousands Flee Democrat-Run California, Breitbart.com's "Big Government", 9-29-12
The Great California Exodus, California Political Review, 9-29-12
Linked on RealClearPolicy.com, 9-29-12
California's Failed Policies Are Driving Away Businesses and Residents, Reason, 9-28-12
Linked on Heritage Insider, 9-28-12
NEW: Study confirms exodus from Golden State, CalWatchdog, 9-27-12
The Great California Exodus: A Closer Look, FoxandHounds, 9-26-12
Dangerous Division, Thomasville Times-Enterprise, 9-26-12
The Great California Exodus: More Californians Packing Their Bags?, CaliforniaCityNews.org, 9-26-12
How many Californians have come to Idaho? A new report offers an answer, The Idaho Statesman, 9-26-12
Businesses, residents continue to flee California for other states, Los Angeles Daily News, 9-26-12

REPORT: Businesses, residents continue to flee California for other states, Contra Costa Times, 9-26-12
The Great California Exodus: A Closer Look, FoxandHounds, 9-26-12
Linked on Flashreport.com, 9-26-12
The Great California Exodus: More Californians Packing Their Bags?, CaliforniaCityNews.org, 9-26-12
Residents continue to flee California for other states, The Willits News, 9-25-12
Exodus fueled by high costs, regulations, San Gabriel Valley Tribune, 9-25-12
Report: Oregon No. 4 destination for ex-Californians, The Oregonian, 9-25-12
Just Like Cali, The Arizona Republic's "Cactus Juice" politics blog, 9-25-12
George Chamberlin's Money in the Morning, San Diego Daily Transcript, 9-25-12
10 states stealing California's population, WSJ's MarketWatch.com, 9-24-12

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| July 1, 1999 | 33,419,000 | 556,000 | 519,000 | 226,000 | 293,000 | 161,245 | 101,755 | 263,000 |
| July 1, 2000 | 34,000,835 | 581,835 | 525,000 | 228,000 | 297,000 | 217,576 | 67,259 | 284,835 |
| July 1, 2001 | 34,512,742 | 511,907 | 529,000 | 232,000 | 297,000 | 282,794 | -67,887 | 214,907 |
| July 1, 2002 | 34,938,290 | 425,548 | 526,000 | 233,000 | 293,000 | 291,191 | -158,643 | 132,548 |
| July 1, 2003 | 35,388,928 | 450,638 | 537,000 | 233,000 | 304,000 | 176,361 | -29,723 | 146,638 |
| July 1, 2004 | 35,752,765 | 363,837 | 540,000 | 239,000 | 301,000 | 252,889 | -190,052 | 62,837 |
| July 1, 2005 | 35,985,582 | 232,817 | 547,000 | 231,000 | 316,000 | 232,006 | -315,189 | -83,183 |
| July 1, 2006 | 36,246,822 | 261,240 | 553,000 | 239,000 | 314,000 | 264,677 | -317,437 | -52,760 |
| July 1, 2007 | 36,552,529 | 305,707 | 565,000 | 235,000 | 330,000 | 228,941 | -253,234 | -24,293 |
| July 1, 2008 | 36,856,222 | 303,693 | 566,000 | 237,000 | 329,000 | 238,433 | -263,740 | -25,307 |
| July 1, 2009 | 37,077,204 | 220,982 | 538,000 | 228,000 | 310,000 | 227,870 | -316,888 | -89,018 |
| July 1, 2010 | 37,318,000 | 240,796 | 516,000 | 228,000 | 288,000 | 208,446 | -255,650 | -47,204 |
| July 1, 2011 | 37,579,000 | 261,000 | 505,000 | 234,000 | 271,000 | 164,445 | -174,445 | -10,000 |

Sources: California Dept. of Finance for population, births, and deaths except for July 2010 to July 2011 births and deaths
U.S. Dept of Homeland Security for foreign immigration based on fiscal year data for 1960 through 1988.
U.S. Bureau of the Census for foreign immigration 1989 through 2011. Birth and death data for July 2010 to July 2011

But then, as we have described, the appeal of California withered. Since 1990, domestic migration to California has flipped to a deficit. In the last two decades, the state lost nearly 3.4 million residents through migration to other states. In other words, it lost about four-fifths of what it had gained through domestic migration in the previous 30 years. Foreign immigration filled the gap only partially. Inflows from overseas peaked at 291,191 in 2002 and sank to just 164,445 in 2011. Meanwhile, net domestic out-migration has averaged 225,000 a year over the past ten years.

In 2005, foreign immigration ceased to make up for the drop in domestic migration to California. Since that year, California's annual net migration has been negative—more people leave the state than come to live in it. Natural increase in the resident population—births minus deaths—cushions the blow of this out-migration, but that, too, is falling. It peaked at 397,000 in 1992 and had dropped to 271,000 by 2011. With continued low levels of fertility and the aging of the baby boomers, natural increase will continue to decline and, in some areas, may already have shifted to a natural decrease. If all these trends continue, California may find itself in a situation similar to that of New York and the states of the midwestern Rust Belt in the last century, which have seen populations stagnate for decades, or even fall.

Who were the big winners in the migration game when California was losing? The answer is the same for both decades since 1990—the Sun Belt giants Florida and Texas, followed by other fast-growing southern and western states. Migration overall declined somewhat from the 1990s to the 2000s, possibly reflecting the more troubled economy of the second decade, especially at its end.

Charts 4 & 5: Domestic Migration in the U.S., 1990–2010




New Report: Exodus from California Due Partially to (Gasp) High Taxes, Unfriendly Business Environment, State Capital News, 9-24-12
Californians flee for better-run states, study finds, FoxNews.com, 9-24-12
Linked on DrudgeReport.com, 9-24-12
California tax fight could go either way -- and Oregon may be beneficiary no matter the result, The Oregonian, 9-20-12

**RADIO**

KSFO's "The Morning Show with Brian Sussman," 10-2-12
KION's "The Mark Carbonaro Show," 9-28-12
KEX 1190 AM's "The Morning Update with Paul Linnman," 9-27-12
KABC Radio "The Doug McIntyre Show," 9-27-12
KXL 101 FM's "Portland's Morning News," 9-27-12
KUHL's "The Andy Caldwell Show," 9-27-12
KABC Radio "The Doug McIntyre Show," 9-27-12
KFI 640 AM's "The John and Ken Show," 9-26-12
Radio America's "The Roger Hedgecock Show," 9-25-12
KPCC (NPR) 89.3's "Air Talk with Larry Mantle," 9-25-12

**TELEVISION**

CNBC's "Squawk on the Street" interviewed Tom Gray, 10-10-12
Fox Business Network's "Tom Sullivan Show" interviewed Steven Malanga, 10-7-12
Newsmax TV interviewed Tom Gray, 10-6-12
WSJ's "Opinion Journal", 9-27-12

**TABLE OF CONTENTS:**

Executive Summary
About the Authors
Introduction
Setting the Scene
PART I: Where Californians Are Moving: IRS Data
PART II: Why Californians Are Moving: Analyzing the Data
Individuals' Reasons to Leave California
Conclusion
Appendix







From 1990 to 2010, California had the highest domestic out-migration in the U.S., with big losses in both decades. Most other big sender states were in Northeast or Upper Midwest. Leading destinations such as Florida (bottom chart) had their biggest gains in the 1990s.

Source: U.S. Bureau of the Census

The states with the largest net in-migrations generally had their biggest gains in the 1990s, though they all continued to attract Americans in the 2000s. Among the big losers, California (like number-two loser New York) shed residents at a consistently high pace for the whole 20 years. Most other big "sender states," such as Illinois, New Jersey, Ohio, and especially Michigan, saw their out-migration accelerate in the 2000s.

In the period we studied, California's out-migration was also high as a percentage of its population—6.11 percent in the 1990s and 5.8 percent in the 2000s. Just a handful of states had less success at keeping their residents. In the 2000s, for instance, only New York (8.27 percent), Michigan (7.12 percent), Illinois (7.09 percent), and New Jersey (5.86 percent) had higher out-migration rates. As that list suggests, California's migration patterns now have more in common with large northeastern and Rust Belt states than with other Sun Belt or western states.

**Table 2: Components of Migration, U.S. States, 1990–2010**

| | Number | | | | | | Rate | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1990s | | | 2000s | | | 1990s | | | 2000s | | |
| | Foreign | Domestic | Net | Foreign | Domestic | Net | Foreign | Domestic | Net | Foreign | Domestic | Net |
| Alabama | 17,105 | 194,784 | 211,888 | 54,666 | 111,040 | 165,707 | 0.42 | 4.82 | 5.24 | 1.23 | 2.50 | 3.73 |
| Alaska | 9,711 | -14,840 | -5,130 | 9,130 | -7,591 | 1,539 | 1.77 | -2.70 | -0.93 | 1.46 | -1.21 | 0.25 |
| Arizona | 123,875 | 956,477 | 1,080,352 | 292,440 | 423,710 | 716,149 | 3.38 | 26.10 | 29.47 | 5.70 | 8.26 | 13.96 |
| Arkansas | 12,530 | 217,307 | 229,837 | 39,203 | 81,971 | 121,175 | 0.53 | 9.24 | 9.78 | 1.47 | 3.07 | 4.53 |
| California | 2,470,423 | -1,821,377 | 649,045 | 1,939,185 | -1,965,599 | -26,414 | 8.29 | -6.11 | 2.18 | 5.73 | -5.80 | -0.08 |
| Colorado | 77,392 | 614,850 | 692,243 | 154,584 | 136,288 | 290,872 | 2.35 | 18.66 | 21.01 | 3.59 | 3.17 | 6.76 |
| Connecticut | 82,326 | -128,933 | -46,607 | 121,451 | -92,519 | 28,932 | 2.50 | -3.92 | -1.42 | 3.57 | -2.72 | 0.85 |
| Delaware | 10,631 | 64,204 | 74,835 | 21,028 | 46,255 | 67,283 | 1.60 | 9.64 | 11.23 | 2.68 | 5.90 | 8.59 |
| District of Columbia | 32,540 | -96,022 | -63,483 | 25,723 | -22,851 | 2,873 | 5.36 | -15.82 | -10.46 | 4.50 | -3.99 | 0.50 |
| Florida | 710,196 | 1,894,932 | 2,605,128 | 916,738 | 1,346,296 | 2,263,035 | 5.49 | 14.65 | 20.14 | 5.74 | 8.42 | 14.16 |
| Georgia | 126,846 | 1,004,907 | 1,131,753 | 302,500 | 393,074 | 695,575 | 1.96 | 15.51 | 17.47 | 3.69 | 4.80 | 8.50 |
| Hawaii | 58,312 | -67,715 | -9,402 | 42,074 | 5,437 | 47,511 | 5.26 | -6.11 | -0.85 | 3.47 | 0.45 | 3.92 |
| Idaho | 20,212 | 170,647 | 190,859 | 23,751 | 111,940 | 135,691 | 2.01 | 16.95 | 18.96 | 1.84 | 8.65 | 10.49 |
| Illinois | 425,051 | -258,444 | 166,607 | 430,627 | -880,248 | -449,621 | 3.72 | -2.26 | 1.46 | 3.47 | -7.09 | -3.62 |
| Indiana | 35,467 | 180,196 | 215,662 | 100,168 | -51,332 | 48,837 | 0.64 | 3.25 | 3.89 | 1.65 | -0.84 | 0.80 |
| Iowa | 24,607 | 25,259 | 49,867 | 38,692 | -45,009 | -6,317 | 0.89 | 0.91 | 1.80 | 1.32 | -1.54 | -0.22 |
| Kansas | 32,763 | 35,036 | 67,798 | 56,138 | -64,864 | -8,726 | 1.32 | 1.41 | 2.74 | 2.09 | -2.41 | -0.32 |
| Kentucky | 18,998 | 170,531 | 189,529 | 47,786 | 74,980 | 122,767 | 0.52 | 4.63 | 5.14 | 1.18 | 1.85 | 3.04 |
| Louisiana | 28,451 | -67,297 | -38,846 | 35,668 | -224,845 | -189,177 | 0.67 | -1.59 | -0.92 | 0.80 | -5.03 | -4.23 |
| Maine | 4,503 | 11,155 | 15,658 | 8,704 | 30,690 | 39,394 | 0.37 | 0.91 | 1.28 | 0.68 | 2.41 | 3.09 |
| Maryland | 146,943 | 34,280 | 181,223 | 205,768 | -76,806 | 128,961 | 3.07 | 0.72 | 3.79 | 3.88 | -1.45 | 2.43 |
| Massachusetts | 165,688 | -124,215 | 41,473 | 263,435 | -328,695 | -65,260 | 2.75 | -2.06 | 0.69 | 4.15 | -5.18 | -1.03 |
| Michigan | 114,112 | -31,842 | 82,270 | 180,082 | -708,110 | -528,027 | 1.23 | -0.34 | 0.89 | 1.81 | -7.12 | -5.31 |
| Minnesota | 63,660 | 193,091 | 256,750 | 113,817 | -90,653 | 23,164 | 1.45 | 4.41 | 5.87 | 2.31 | -1.84 | 0.47 |
| Mississippi | 8,077 | 106,864 | 114,941 | 19,054 | -61,106 | -42,052 | 0.31 | 4.15 | 4.46 | 0.67 | -2.15 | -1.48 |
| Missouri | 43,731 | 215,415 | 259,145 | 68,026 | 64,900 | 132,926 | 0.85 | 4.21 | 5.06 | 1.22 | 1.16 | 2.38 |
| Montana | 3,011 | 63,959 | 66,970 | 3,310 | 46,605 | 49,915 | 0.38 | 8.00 | 8.38 | 0.37 | 5.17 | 5.53 |
| Nebraska | 17,691 | 30,581 | 48,272 | 34,277 | -40,540 | -6,263 | 1.12 | 1.94 | 3.06 | 2.00 | -2.37 | -0.37 |
| Nevada | 64,167 | 604,163 | 668,330 | 118,782 | 385,983 | 504,765 | 5.34 | 50.28 | 55.62 | 5.94 | 19.32 | 25.26 |
| New Hampshire | 8,354 | 56,080 | 64,434 | 19,689 | 10,658 | 30,347 | 0.75 | 5.06 | 5.81 | 1.59 | 0.86 | 2.46 |
| New Jersey | 414,113 | -189,067 | 225,045 | 427,489 | -492,878 | -65,390 | 5.34 | -2.44 | 2.90 | 5.08 | -5.86 | -0.78 |
| New Mexico | 42,051 | 108,486 | 150,537 | 50,942 | 35,235 | 86,177 | 2.78 | 7.16 | 9.94 | 2.80 | 1.94 | 4.74 |
| New York | 1,193,783 | -1,303,173 | -109,390 | 895,150 | -1,570,310 | -675,160 | 6.64 | -7.24 | -0.61 | 4.72 | -8.27 | -3.56 |
| North Carolina | 74,085 | 924,292 | 998,377 | 230,920 | 714,548 | 945,468 | 1.12 | 13.94 | 15.05 | 2.87 | 8.88 | 11.75 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| North Dakota | 5,893 | -28,561 | -22,668 | 4,981 | -2,274 | 2,707 | 0.92 | -4.47 | -3.55 | 0.78 | -0.35 | 0.42 |
| Ohio | 61,412 | -88,084 | -26,673 | 129,215 | -412,728 | -283,513 | 0.57 | -0.81 | -0.25 | 1.14 | -3.64 | -2.50 |
| Oklahoma | 32,875 | 121,995 | 154,870 | 57,560 | 56,879 | 114,438 | 1.05 | 3.88 | 4.92 | 1.67 | 1.65 | 3.32 |
| Oregon | 74,645 | 348,243 | 422,888 | 101,814 | 128,821 | 230,635 | 2.63 | 12.25 | 14.88 | 2.98 | 3.77 | 6.74 |
| Pennsylvania | 127,779 | -17,688 | 110,091 | 190,322 | 32,201 | 222,523 | 1.08 | -0.15 | 0.93 | 1.55 | 0.26 | 1.81 |
| Rhode Island | 18,394 | -11,551 | 6,842 | 32,325 | -58,947 | -26,622 | 1.83 | -1.15 | 0.68 | 3.08 | -5.62 | -2.54 |
| South Carolina | 22,687 | 291,783 | 314,470 | 71,471 | 330,099 | 401,570 | 0.65 | 8.37 | 9.02 | 1.78 | 8.23 | 10.01 |
| South Dakota | 5,521 | 15,417 | 20,939 | 7,067 | 3,764 | 10,832 | 0.79 | 2.22 | 3.01 | 0.94 | 0.50 | 1.43 |
| Tennessee | 36,127 | 533,754 | 569,880 | 98,590 | 286,499 | 385,088 | 0.74 | 10.94 | 11.68 | 1.73 | 5.04 | 6.77 |
| Texas | 795,951 | 1,143,856 | 1,939,807 | 998,690 | 781,542 | 1,780,232 | 4.69 | 6.73 | 11.42 | 4.79 | 3.75 | 8.54 |
| Utah | 35,816 | 177,548 | 213,364 | 70,371 | 37,098 | 107,469 | 2.08 | 10.31 | 12.38 | 3.15 | 1.66 | 4.81 |
| Vermont | 5,609 | 16,970 | 22,579 | 5,308 | -3,487 | 1,821 | 1.00 | 3.02 | 4.01 | 0.87 | -0.57 | 0.30 |
| Virginia | 163,644 | 299,495 | 463,139 | 219,986 | 199,650 | 419,635 | 2.64 | 4.84 | 7.48 | 3.11 | 2.82 | 5.93 |
| Washington | 164,962 | 478,786 | 643,748 | 217,347 | 197,800 | 415,147 | 3.39 | 9.84 | 13.23 | 3.69 | 3.36 | 7.04 |
| West Virginia | 3,842 | -2,955 | 887 | 6,040 | 39,059 | 45,099 | 0.21 | -0.16 | 0.05 | 0.33 | 2.16 | 2.49 |
| Wisconsin | 29,697 | 200,239 | 229,936 | 75,399 | -19,910 | 55,489 | 0.61 | 4.09 | 4.70 | 1.41 | -0.37 | 1.03 |
| Wyoming | 2,257 | 8,831 | 11,089 | 3,559 | 33,802 | 37,360 | 0.50 | 1.95 | 2.44 | 0.72 | 6.85 | 7.57 |

Source: U.S. Bureau of the Census, RLS Demographics

California is still contributing to the population boom of the southwestern U.S. but now seems to do so mainly by sending residents to neighboring states. The fastest-growing state in the nation, Nevada, is also the one with its population centers nearest those of California: Las Vegas and Reno are, respectively, just a half-day's drive from Los Angeles or San Francisco. Arizona is another fast-growing destination state in the California neighborhood.

Chart 6: Net Domestic Migration Rates in the 2000s






Southern and Western states—led by Nevada, the Carolinas, Idaho, Arizona and Florida—had the top domestic and net migration rates in the 2000s. California was the exception to this regional trend.

Source: U.S. Bureau of the Census

## Part I: Where Californians are Moving: IRS Data

When Californians leave, where do they go? The answer helps point us toward the all-important issue of why people are leaving—and what this says about the state's future.

To identify favored "target states" for out-migration, the most useful tool is the annual data from the Internal Revenue Service showing how many filers of income-tax returns have moved between two years. Our analysis of these data reveals in some detail the starting points and destinations of those who have left California. It also allows us to make some reasonable inferences about their motives.

This IRS information is not a perfect tool. It leaves out students, low-income persons, the elderly, and others who may not file income-tax returns, and it does not track moves associated with first-time or final filings. For these reasons, it does not produce as high a total for net migration from California as the Census figures do. But the IRS records show migration between specific states, metropolitan areas, and counties (see Appendix). In this study, we have taken advantage of this feature of the data to map the California exodus in detail.

We analyzed IRS migration data on year-to-year periods starting with 2000–01 and ending with 2009–10 (ten years in all). We looked first at migration between California and other states, to see which states are most popular as destinations for Californians and which states continue to send a significant number of residents to the Golden State. Second, we took a finer-grained look at population movements in different regions of the state, to examine more precisely where inside California the migrants came from.

### A. Migration from and to California

The IRS data show a pattern of movement over the past decade from California mainly to states in the western and southern United States. Texas, Nevada, and Arizona, in that order, are the top magnet states on the basis of the net migration (measured by tax exemptions) that they drew from California between 2000 to 2010. Oregon, Washington, Colorado, Idaho, and Utah follow. Rounding out the top ten are two southern states, Georgia and South Carolina. On the other hand, the top ten sender states—those that lost more residents to California than they gained—are all in the Northeast or Midwest. New York, Illinois, and New Jersey are the largest in this category, though their deficits with California are far smaller than California's deficits with its leading destination states.

The IRS data also put a dollar figure on migration patterns. Along with totals for the number of individuals moving between states, the IRS adds up the income reported in the tax returns of migrants. The agency's data reveal just how much wealth California is losing as a result of its people's exodus. This is not only a measure of economic damage but also of political and fiscal consequences because the state government depends heavily on personal income tax for its revenue.

Table 3: Net Migration Between California and Other States, 2000–10

| | 2000-2001 | 2001-2002 | 2002-2003 | 2003-2004 | 2004-2005 | 2005-2006 | 2006-2007 | 2007-2008 | 2008-2009 | 2009-2010 | Total 2000-2010 | Rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALABAMA | -411 | -515 | -815 | -924 | -1,652 | -1,543 | -1,275 | -920 | -1,064 | -642 | -9,761 | 21 |
| ALASKA | 34 | -326 | 63 | -95 | -307 | -86 | -17 | -236 | -739 | -678 | -2,387 | 32 |
| ARIZONA | -9,866 | -15,156 | -15,616 | -24,620 | -45,265 | -49,026 | -31,408 | -15,533 | -3,821 | -1,622 | -211,933 | 2 |
| ARKANSAS | -1,333 | -1,756 | -1,800 | -2,237 | -3,613 | -4,332 | -3,446 | -2,519 | -1,485 | -1,309 | -23,830 | 16 |
| COLORADO | -5,555 | -4,834 | -1,498 | -2,284 | -7,192 | -10,661 | -11,297 | -7,991 | -6,431 | -4,379 | -62,122 | 6 |
| CONNECTICUT | 914 | 50 | -115 | 520 | 515 | 871 | 742 | 878 | 626 | 687 | 5,688 | 43 |
| DELAWARE | 106 | -87 | -192 | -67 | -135 | 46 | -9 | 171 | 46 | 50 | -71 | 38 |
| DISTRICT OF COLUMBIA | 279 | 46 | -125 | -222 | -154 | 15 | -25 | 71 | -289 | -582 | -986 | 34 |
| FLORIDA | -2,178 | -6,133 | -6,223 | -7,965 | -9,769 | -5,762 | -1,928 | 2,079 | 2,653 | 451 | -34,775 | 11 |
| GEORGIA | -2,349 | -3,318 | -2,694 | -3,989 | -6,346 | -8,572 | -7,467 | -2,847 | -1,505 | -487 | -39,574 | 9 |