JAURIGUE LAW GROUP
Michael J. Jaurigue (SBN 208123)
Abigail A. Zelenski (SBN 228610)
David Zelenski (SBN 231768)
114 North Brand Boulevard, Suite 200
Glendale, California 91203
michael@jlglawyers.com
abigail@jlglawyers.com
david@jlglawyers.com
Telephone: (818) 630-7280
Facsimile: (888) 879-1697

*Attorneys for Plaintiff John Luna*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JOHN LUNA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHAC, LLC dba SAPPHIRE GENTLEMEN'S CLUB, a Nevada corporation,<br><br>Defendant. | Case No. CV 14-00607 HRL<br><br>**PLAINTIFF JOHN LUNA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT SHAC, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>*Assigned to Hon. Howard R. Lloyd*<br><br>Date: June 23, 2015<br>Time: 10:00 a.m.<br>Courtroom: 2 |

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 2

III. ARGUMENT ..... 5

A. Legal Standard on Summary Judgment ..... 5

B. SHAC's Motion for Summary Judgment Should Be Denied Because Plaintiff's Text Message Was Sent Using an ATDS ..... 6

1. The Definition of ATDS Includes Sending Text Messages From Preprogrammed Databases ..... 6

2. The Hobbs Act Requires the District Court to Apply the FCC's Expanded Definition of ATDS to Include Preprogrammed Databases ..... 8

3. Satterfield Is Not on Point, and This Court Has No Jurisdiction to Ignore the FCC's Rulings Expanding the Definition of an ATDS ..... 11

C. SHAC's Motion for Summary Judgment Should Be Denied Because Plaintiff's Text Message Was Sent Without the Requisite Human Intervention ..... 16

IV. CONCLUSION ..... 19

# TABLE OF AUTHORITIES

***Cases***

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986)....................5

Bhan v. NME Hospitals, Inc.
929 F.2d 1404 (9th Cir. 1991) ....................5

CE Design, Ltd. v. Prism Bus. Media, Inc.
606 F.3d 443 (7th Cir.2010) ....................9, 14, 15

Chevron U .S.A., Inc. v. Natural Res. Def. Council, Inc.
467 U.S. 837 (1984)....................13, 14

Davis v. Diversified Consultants, Inc.
36 F. Supp. 3d 217 (D. Mass. 2014) ....................18

Dominguez v. Yahoo! Inc..
8 F. Supp. 3d 637 (E.D. Pa. Mar. 20, 2014) ....................11, 12

FCC v. ITT World Commc'ns, Inc.
466 U.S. 463 (1984)....................9

Fla. Power & Light Co. v. Lorion
470 U.S. 729 (1985)....................9

Garter-Bare Co. v. Munsingwear, Inc.
650 F.2d 975, 980 (9th Cir. 1980) ....................5

Glauser v. GroupMe, Inc.
2015 WL 475111 (N.D. Cal. Feb. 4, 2015) ....................7, 15, 16, 17, 19, 20

Griffith v. Consumer Portfolio Serv., Inc.
838 F. Supp. 2d 723 (N.D. Ill. 2011) ....................18, 19

Hernandez v. Collection Bureau of Am., Ltd.
2014 WL 4922379 (C.D. Cal. Apr. 16, 2014) ....................12, 13, 15, 19

Indus. Bldg. Materials, Inc. v. Interchemical Corp.
437 F.2d 1336 (9th Cir. 1970) ....................5

Johnson v. Yahoo!, Inc.
2014 WL 7005102 (N.D. Ill. Dec. 11, 2014)....................14, 19

Katz v. Children's Hosp. of Orange Cnty.
28 F.3d 1520 (9th Cir. 1994). ....................5

Leckler v. Cashcall, Inc .
2008 WL 5000528 (N.D. Cal. Nov. 21, 2008) ....................10

Marks v. Crunch San Diego.
55 F. Supp. 3d 1288 (S.D. Cal. 2014)....................11, 12

Mais v. Gulf Coast Collection Bureau, Inc.
768 F.3d 1110 (11th Cir. 2014) ....................9

McKenna v. WhisperText.
2015 WL 428728 (N.D. Cal. Jan. 30, 2015)....................16, 17, 19, 20

McSherry v. City of Long Beach
584 F.3d 1129 (9th Cir. 2009) ....................5

Moore v. Dish Network, L.L.C.
2014 WL 5305960 (N.D. W. Va. Oct. 15, 2014)....................8, 18

Moriarity v. Nationstar Mortg., LLC
2014 WL 801021 (E.D. Cal. Feb. 27, 2014)....................8

Nack v. Walburg
715 F.3d 680 (8th Cir.2013) ....................9

Poller v. Columbia Broadcasting System, Inc.
368 U.S. 464 (1962)....................5

Santos v. Wells Fargo Bank, N.A.
2013 WL 1339585 (S.D. Cal. Apr. 3, 2013)....................14

Satterfield v. Simon & Schuster, Inc.
569 F.3d 946 (9th Cir. 2009) .................... *passim*

Sherman v. Yahoo! Inc.
997 F. Supp. 2d 1129 (S.D. Cal. 2014)....................16

Sterk v. Path, Inc.
46 F. Supp. 3d 813 (N.D. Ill. 2014) ....................7, 18

T.W. Elec. Serv. v. Pacific Elec. Contractors Assoc.
809 F.2d 626 (9th Cir. 1987) ....................5

US W. Commc'ns, Inc. v. Hamilton
224 F.3d 1049 (9th Cir. 2000) ....................10

US W. Commc'ns v. MFS Intelnet, Inc.
193 F.3d 1112 (9th Cir. 1999) ....................10

United States v. Dunifer
219 F.3d 1004 (9th Cir.2000) ....................9

Wilson v. A.H. Belo Corp.
87 F.3d 393 (9th Cir.1996) ....................10, 13

***Statutes***

28 U.S.C. § 2342 ....................8, 9, 10, 13, 14, 15

28 U.S.C. § 2344 ....................10

47 U.S.C. § 227 ....................6, 11, 13, 14

47 U.S.C. § 402 ....................8, 9, 10, 13

***Rules and Regulations***

Fed. R. Civ. P. 56 ....................5

Report and Order, In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991
18 FCC Rcd. 14014 (July 3, 2003) ....................6, 16, 18

Request of ACA International for Clarification and Declaratory Ruling, In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991
23 FCC Rcd. 559 (Jan. 4, 2008) ....................7, 17, 18, 20

Petition for Expedited Declaratory Ruling, In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991
27 FCC Rcd. 15391 (Nov. 29, 2012) ....................7

# I. INTRODUCTION.

As the owner and operator of Sapphire Gentlemen's Club ("Sapphire")—the world's largest Las Vegas Strip club—Defendant SHAC, LLC ("SHAC") sent thousands of text messages to consumers like Plaintiff marketing dozens of Sapphire events using a third-party marketer, CallFire, Inc. ("CallFire").[1] Instead of sending one text message at a time, SHAC used equipment having the capacity to send tens of thousands of messages to recipients with the single press of a button or, more importantly, *with automated scheduling*—all in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The evidence marshalled in this action clearly shows that SHAC utilized an automatic telephone dialing system ("ATDS") as defined by the Federal Communications Commission ("FCC") in sending one such message to Plaintiff. The FCC has the power to issue rulings interpreting the TCPA, and, under the Hobbs Act, district courts lack the jurisdiction to do anything other than apply those rulings as written.[2]

In its Motion for Summary Judgment,[3] SHAC attempts to convince this Court otherwise by incorrectly advising that the FCC's rulings under the TCPA are not binding on this Court. In support, SHAC relies principally on the Ninth Circuit's decision in Satterfield v. Simon & Schuster, Inc., 569 F.3d 946 (9th Cir. 2009). As explained by two recent district-court opinions, however, Satterfield is a red herring that nowhere discusses the Hobbs Act, let alone the jurisdictional bind it places on district courts. In point of fact, there is no Ninth Circuit opinion—Satterfield or otherwise—holding that FCC rulings can be ignored at the trial-court level. Accordingly, in determining whether the system utilized

---

[1] CallFire is a former Defendant in this action. Judgment was entered against CallFire on March 26, 2015, following Plaintiff's acceptance of an Offer of Judgment under rule 68 of the Federal Rules of Civil Procedure. (J. in a Civil Case [ECF 84] at 1:14–19.)

[2] The Hobbs Act is known more formally as the Administrative Orders Review Act, 28 U.S.C. § 2342(1).

[3] The Motion was filed in violation of the October 1, 2014, San Jose Division Standing Order Regarding Case Management in Civil Cases ("Standing Order"). The Standing Order provides, in relevant part, that, "[b]efore selecting a hearing date for a motion before any of the judges of the San Jose Division, counsel must confer with opposing counsel to determine that the proposed hearing date will not cause undue prejudice." (Oct. 1, 2014, Standing Order at 1:19–21.) Notwithstanding the fact that Plaintiff's counsel had contacted SHAC's counsel at least five times between April 29, 2015, and May 18, 2015, to discuss Plaintiff's Motion for Class Certification—filed on May 19, 2015—SHAC's counsel did not once mention that a Motion for Summary Judgment would be filed until after actually filing it. (Decl. of Abigail Zelenski in Opp'n to Def.'s Mot. for Summ. J. ("Zelenski Decl.") [filed concurrently] ¶ 2.)

by SHAC constitutes an ATDS, this Court must apply the definition of ATDS set forth in recent FCC orders.[4]

Because this Court must follow the FCC's definition of an ATDS, the only question that remains is, are all of the elements of that definition present in the within case? According to the FCC's definition, an ATDS requires: (1) that the system have the capacity to store and dial telephone numbers from a calling list, and (2) that the system have the capacity to dial those numbers automatically, *i.e.*, without human intervention. The evidence is clear that CallFire's system had the capacity to store preprogrammed lists of numbers, as well as to dial those numbers automatically using various scheduling features. All of the requisite elements for an ATDS, as set forth by the FCC, are therefore present in this case. SHAC's Motion therefore must be denied.

## II. STATEMENT OF FACTS.

SHAC has owned and operated Sapphire for over a decade. (Zelenski Decl. Ex. 2 [Dep. Tr. of Shai Cohen] at 12:19–21, 17:25–18:3.) In January 2014, Plaintiff received an unwanted text message from SHAC promoting Sapphire.[5] (Apr. 21, 2014, Decl. of John Luna in Opp'n to Def.'s Mot. to Dismiss [ECF 16] at ¶ 3 ("On or around January 22, 2014, I received the text message on my cellular telephone advertising an event at Sapphire Gentlemen's Club ('Sapphire'). The text message stated, in full: '-SAPPHIRE- Hosts the BIGGEST & SEXIEST UFC/SUPER SUNDAY WEEKED IN LV! Food, Raffles , Prizes & Half Time $1 Dances. 4 more info click http://bit.ly.slvsupersun.'").) SHAC admits that it sent this text message to Plaintiff "via a technology platform provided by former co-Defendant CallFire."[6] (Mem. of P. & A. in Supp. of SHAC's Mot. for Summ. J. ("SHAC's Mot.") [ECF

[4] As explained below, even if SHAC were correct that Satterfield constitutes some sort of precedent, the issue boils down to one of jurisdiction versus precedent—and jurisdiction obviously controls over precedent.

[5] Plaintiff was one of tens of thousands of persons who received Sapphire-promotional text messages, as detailed in Plaintiff's Motion for Class Certification. (See generally Decl. of David Zelenski in Supp. of Mot. for Class Cert. Ex. 16 [ECF 88-20] [Dr. Andrew Safir's Report].)

[6] Plaintiff's TCPA claim is alleged on a class-wide basis on behalf of individuals receiving texts on or after October 16, 2013. (First Am. Compl. [ECF 44] ¶ 15.) SHAC's rule 30(b)(6) designee—Shai Cohen, director of marketing for Sapphire—testified that, since October 16, 2013, all of SHAC's text messages were sent through the use of a website by the name of "EZTexting.com." (Zelenski Decl. Ex. 2 [Dep. Tr. of Shai Cohen] at 12:12–18, 12:22–13:17, 19:10–16, 42:14–43:16, 49:18–50:16, 52:21–53:19.) Beyond his designation as SHAC's corporate representative, Mr. Cohen had personal knowledge of SHAC's text-message campaigns, having been the individual who "personally [went] into the website, log[ged] in, and type[d] the message[s]." (Zelenski Decl. Ex. 2 [Dep. Tr. of Shai Cohen] at

85] at 2:26–3:2.)

According to CallFire's corporate designee, CallFire's system works by transmitting bulk messages to recipients whose telephone numbers have been uploaded into its system. Also, according to CallFire's designee, SHAC could upload its list of contacts into CallFire's system three different ways: uploading an Excel spreadsheet, manually inputting the contacts, or cutting and pasting from a separate file. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 177:20–179:23.[7]) Once the numbers were uploaded, they continued to be stored on CallFire's system indefinitely. (Zelenski Decl. Ex. 3 [CallFire's Supplemental Resps. to Pl. John Luna's First Set of Interrogs.] at 10:20–22 (admitting that "CallFire subscribers have the ability to store the telephone numbers they input into their accounts for their later use").) Importantly, after uploading and storing the numbers, SHAC either could transmit its messages in real time by composing them and then immediately hitting "send," or could have CallFire's system "automate the process" by prescheduling messages to be transmitted "[a]t some future date" and time, "[w]ithout any further action needing to be taken by [SHAC]" itself. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 183:16–18, 186:5–188:14, Ex. 28) ("Q: What does "Schedule

---

19:13–20:16.) During his deposition, Mr. Cohen testified that, at some point, SHAC had utilized a separate website by the name of "Club Texting" to transmit SHAC's messages. (Zelenski Decl. Ex. 2 [Dep. Tr. of Shai Cohen] at 49:18–50:16, 52:21–53:19.) Although Mr. Cohen did not recall the exact date that SHAC had switched from the Club Texting website to the EZTexting website, he did "believe that [the transition had taken place] prior to October 16[], 2013." (Zelenski Decl. Ex. 2 [Dep. Tr. of Shai Cohen] at 50:4–16.) According to Mr. Cohen, those were the only two websites that SHAC ever used to transmit messages about Sapphire. (Zelenski Decl. Ex. 2 [Dep. Tr. of Shai Cohen] at 50:23–51:4, 52:21–53:13.) In any event, CallFire's rule 30(b)(6) designee testified that CallFire has operated the Club Texting website since December 2012. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 29:1–13.) That website—along with all of CallFire's other text-messaging websites—functions using the exact same infrastructure as the EZTexting website. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 21:23–25, 23:2–19, 25:4–12, 27:24–29:13, 31:7–39:11, 42:1–3 68:10–73:18, 82:16–83:9, 84:5–86:10.) As explained by CallFire's designee, the only differences across CallFire's websites concern "branding," not the "underlying infrastructure that's used to transmit messages," including the "equipment" and "software that ends up being used to route text messages . . . to consumers." (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 35:7, 35:14–15, 71:12–24.) Regardless, then, of which specific website "brand" SHAC used—*e.g.*, EZTexting, Club Texting, or some other CallFire website—the underlying equipment never changed. According to CallFire's director of corporate development, CallFire has "operated and controled [*sic*] the website www.EZTexting.com at all times relevant to the Complaint." (Decl. of Shahriyar Neman in Supp. of Defs. CallFire, Inc. & Club Texting, Inc.'s Mot. to Dismiss First Am. Compl. [ECF 52-3] ¶ 4.) Consequently, SHAC utilized CallFire's infrastructure to send the at-issue text message to Plaintiff. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 21:23–25, 23:2–19, 25:4–12, 27:24–29:13, 31:7–39:11, 68:10–73:18, 82:16–83:9, 84:5–86:10.)

[7] Mr. Thinakaran is CallFire's chief operating officer and was CallFire's rule 30(b)(6) corporate designee. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] 18:9–17.)

Delivery" mean? A: The customer can set the time at which they would like to send out. Q: They can set a time at which to send out a text message in the future, correct? A: Correct. *Q: To automate the process, basically; correct? . . . A: Yeah.* Q: Pardon? What was the answer? A: They can set the time. Q: Set the date and the time, correct? A: Correct. Q: Some future date and time; correct? A: At some future date and time, yes.") (emphasis supplied).)

More specifically, CallFire's system had several different features—variously referred to by CallFire as "scheduling," "drip campaigns," and "recurring messages"—that enabled SHAC to set up the delivery of automated, recurring messages. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 188:21–189:18) ("Q: So it has been that way since October 16, 2013? A: The scheduled delivery function has been around for a while, yes."), 191:1–3, 198:23–199:7 ("Q: CallFire's system has the capability to send out prescheduled text messages; correct? . . . A: CallFire has the ability to transmit messages that have been scheduled, in the future."), 199:14–200:8, 201:5–13, 202:10–203:8 ("Q: With respect to CallFire's present system capabilities, can a customer choose, quote, 'Whether or not to send messages to people who join the contact group after they schedule the message, but before it is sent?' . . . A: Yes. Q: And that capability has existed since October 16, 2013? A: Yes."), 204:5–205:18 ("Q: Using CallFire's system, presently speaking, can a CallFire customer utilize the drip campaign feature to automatically send a timed series of text messages to group of contacts? A: The CallFire customer can, yes."), 206:1–207:1, 207:23–208:4, 209:7–13.[8]) Indeed, the recurring-message feature even had the capacity to transmit messages to telephone numbers that were uploaded *after* SHAC had programmed a particular schedule into the system. (Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 202:10–24, 206:1–207:1 (stating that "[y]ou can even cho[o]se whether or not to send the message to people who join the contract group after you schedule the message, but

---

[8] This testimony was provided with reference to a document appended as "Exhibit 1" to Plaintiff's second set of requests for admission to CallFire. (<u>See</u> Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 191:1–193:15; Zelenski Decl. Ex. 4 [Pl. John Luna's Reqs. for Admission to CallFire (Set Two)] at 2:7–8.) Prior to the deposition, CallFire admitted that Exhibit 1 to Plaintiff's second set of requests for admission was an authentic printout from CallFire's website. (Zelenski Decl. Ex. 5 [CallFire's Supplemental Resps. to Pl. John Luna's Sec. Set of Reqs. for Admission] at 4:24–5:8.) In order to ensure an adequate record, the deposition exhibits that are appended to the concurrently filed Declaration of Abigail Zelenski include all of the exhibits referred to by any deponent in his or cited deposition-testimony excerpts, including "Exhibit 1."

before it is sent"), 207:23–208:4.) In other words, the system permitted SHAC to create a message, set a schedule, and thereafter add additional message recipients to an already-created campaign. Those recipients then would automatically receive the message even though the schedule had been inputted into the system *before* their numbers were added to the system's database. As explained below, these automated features qualify CallFire's system as an ATDS within the meaning of the TCPA.

## III. ARGUMENT.

### A. Legal Standard on Summary Judgment.

Summary judgment is appropriate only where no genuine issue of material fact exists and a party is entitled to prevail in the case as a matter of law. Fed. R. Civ. P. 56; Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). The party requesting summary judgment has the initial burden to show that there are no genuine issues of material fact. Id. (citing T.W. Elec. Serv. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 632 (9th Cir. 1987)). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). See also Katz v. Children's Hosp. of Orange Cnty., 28 F.3d 1520, 1534 (9th Cir. 1994).

On a motion for summary judgment, all justifiable inferences are to be drawn in the favor of the non-moving party, and his or her evidence is to be believed. McSherry v. City of Long Beach, 584 F.3d 1129, 1135 (9th Cir. 2009); Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 491 (1962). "If, under any reasonable construction of the evidence and any acceptable theory of law, one would be entitled to prevail, the summary judgment against him cannot be sustained." Indus. Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1340 (9th Cir. 1970); Garter-Bare Co. v. Munsingwear, Inc., 650 F.2d 975, 980 (9th Cir. 1980).

Based on the foregoing standards, a reasonable juror could conclude that the automated features described above qualify CallFire's system as an ATDS—especially in light of binding FCC authority that automated dialing from a preprogrammed list of numbers is an ATDS.

/ / / / /

**B. SHAC's Motion for Summary Judgment Should Be Denied Because Plaintiff's Text Message Was Sent Using an ATDS.**

**1. The Definition of ATDS Includes Sending Text Messages From Preprogrammed Databases.**

The TCPA defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). However, since Congress has expressly conferred authority on the FCC to issue interpretative rules pertaining to the TCPA, this definition may be broadened by the FCC. 47 U.S.C. § 227(b)(2) ("The [Federal Communications] Commission shall prescribe regulations to implement the requirements of this subsection [227(b)].").[9] Bestowed with such authority, the FCC has issued several rulings expanding the statutory definition of ATDS.

In 2003, the FCC noted that "Congress [had] anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies" and that "the evolution of the teleservices industry had progressed to the point where using lists of numbers is far more cost effective" than simply dialing numbers with the use of a random or sequential number generator. Report and Order, <u>In the Matter of Rules and Regulations Implementing the TCPA of 1991</u>, 18 FCC Rcd. 14014, 14092 (July 3, 2003). As such, to exclude equipment that has the capacity to dial from preprogrammed lists of numbers "simply because it relies on a given set of numbers would lead to an unintended result." <u>Id.</u>

In 2008, the FCC confirmed that it was the intent of Congress to include within the statutory definition of an ATDS equipment that has the capacity to dial numbers from a preprogrammed database of numbers. Specifically, the FCC ruled:

> The Commission explained in its 2003 TCPA Order that "a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce

---

[9] This is the section under which Plaintiff's TCPA claim is brought.

numbers and dial those numbers at random, in sequential order, *or from a database of numbers*. . . [i]n most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at rate to ensure that when a consumer answers the phone, a sales person is available to take the call."[10]

Request of ACA International for Clarification and Declaratory Ruling, In the Matter of Rules & Regulations Implementing the TCPA of 1991, 23 FCC Rcd. 559, 563 n. 23 (Jan. 4, 2008) (emphasis supplied; italics in original). In 2012, the FCC reiterated that the statutory definition of ATDS to include "*any* equipment"—not just predictive dialers *per se*—that "ha[ve] the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." Petition for Expedited Declaratory Ruling, In the Matter of Rules and Regulations Implementing the TCPA of 1991, 27 FCC Rcd. 15391, 15392 n.5 (Nov. 29, 2012) (emphasis supplied).

The takeaway from the FCC's expanded ATDS definition is clear: If the equipment used to send messages has the "capacity" to dial numbers automatically from a preprogrammed database—instead of from a random or sequential number generator—it qualifies as an ATDS. In other words, "a system need not actually store, produce, or call" numbers automatically; "it need only have the *capacity* to do it." Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 951 (9th Cir. 2009) (emphasis supplied). As explained below, this new rule is binding on this Court under the Hobbs Act. See, e.g., Sterk v. Path, Inc., 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) (holding that the use of a preprogrammed list constitutes an ATDS in light of the requirement under the Hobbs Act that "a district court [must] give[] great

[10] Even according to the Northern District of California's opinion in Glauser v. GroupMe, Inc., 2015 WL 475111 (N.D. Cal. Feb. 4, 2015)—an opinion heavily cited by SHAC—predictive dialers constitute just another example of an ATDS:

> Thus, even though the statute defines "ATDS" narrowly, as having the capacity to use "a random or sequential number generator," the FCC made clear that the definition now includes "predictive dialers," which may dial numbers from preprogrammed lists, and which need not necessarily generate numbers randomly or sequentially. As a result, the court rejects defendant's argument that "[t]he plain text of the TCPA and the FCC's implementing regulations have always defined an autodialer as a 'random or sequential number generator.'" While the statute did indeed define an autodialer as such, the FCC's implementing regulations have expanded that definition, based on changes in technology, to include predictive dialers.

Glauser, 2015 WL 475111 at *5 (internal citations omitted).

weight, if not controlling weight, to final decisions of the FCC implementing and interpreting the TCPA"); Moore v. Dish Network, L.L.C., 2014 WL 5305960 at *12 (N.D. W. Va. Oct. 15, 2014) (in rejecting a defendant's argument that the FCC's definition of an ATDS conflicts with the TCPA's statutory language, explaining that such an "argument is not persuasive because district courts must defer to FCC rulings"). Therefore, CallFire's system—which has the ability to send thousands of texts from preprogrammed lists, preschedule outgoing text messages, create recurring messages, and add recipients to an already-created text-message campaign—qualifies as an ATDS.

### 2. The Hobbs Act Requires the District Court to Apply the FCC's Expanded Definition of ATDS to Include Preprogrammed Databases.

Although it is clear that the system used by SHAC to send the at-issue text message constitutes an ATDS, SHAC argues otherwise. To reach this conclusion, SHAC mistakenly argues that the FCC's rulings expanding the definition of an ATDS are not binding on this Court. Instead, as SHAC contends, this Court should look only to the four corners of the TCPA for the definition of an ATDS. To the contrary, though, the Hobbs Act, 28 U.S.C. § 2342(1), and the Federal Communications Act, 47 U.S.C. § 402(a), operate together to restrict district courts from invalidating certain actions by the FCC. The Federal Communications Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter . . . shall be brought as provided by and in the manner prescribed in [the Hobbs Act]." 47 U.S.C. § 402(a). Under the Hobbs Act, in turn, "[t]he *court of appeals* . . . has *exclusive* jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of (1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342 (emphasis supplied). See also Moriarity v. Nationstar Mortg., LLC, 2014 WL 801021 at *4 (E.D. Cal. Feb. 27, 2014) (explaining that "[c]ourts of this circuit have recognized that the FCC's pronouncement constitutes rulemaking within the meaning of the TCPA and [is] *immune from challenge* in federal district court pursuant to the Hobbs Act, 28 U.S.C. § 2342") (emphasis supplied). In other words, the Hobbs Act jurisdictionally divests this Court from ignoring FCC rulings interpreting the TCPA. As such, this Court must look not only to the statutory language in applying the definition of an ATDS, but also to FCC rulings addressing the same, since only courts of appeal have jurisdiction to determine the validity of FCC rulings.

With respect to the 2008 FCC Order noted above, for example, the Eleventh Circuit ruled in Mais v. Gulf Coast Collection Bureau, Inc., 768 F.3d 1110 (11th Cir. 2014), that a district court had exceeded its power by considering the validity of the 2008 FCC Ruling, holding that "Congress unambiguously deprived federal courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals." Id. at 1113. In ruling that district courts have no jurisdiction to determine the validity of the FCC order, the Eleventh Circuit held:

> The district court exceeded its jurisdiction by declaring the 2008 FCC Ruling to be inconsistent with the TCPA. Section 402(a) of the Communications Act provides that (except in limited circumstances not relevant here) any "proceeding to enjoin, set aside, annul, or suspend any order of the Commission" must be brought under the Hobbs Act. 47 U.S.C. § 402(a). The Hobbs Act, in turn, expressly confers on the federal courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" such FCC orders. 28 U.S.C. § 2342; see FCC v. ITT World Commc'ns, Inc., 466 U.S. 463, 468, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984) ("Exclusive jurisdiction for review of final FCC orders ... lies in the Court of Appeals."). This procedural path created by the command of Congress "promotes judicial efficiency, vests an appellate panel rather than a single district judge with the power of agency review, and allows 'uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress' to enforce the TCPA." CE Design, Ltd. v. Prism Bus. Media, Inc., 606 F.3d 443, 450 (7th Cir.2010) (quoting United States v. Dunifer, 219 F.3d 1004, 1008 (9th Cir.2000)); see Nack v. Walburg, 715 F.3d 680, 685 (8th Cir.2013), cert. denied, ––– U.S. –––, 134 S.Ct. 1539, 188 L.Ed.2d 581 (2014). In explaining the reach of the Hobbs Act, the Supreme Court has instructed that, "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 745, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

Mais, 768 F.3d at 1119.

Likewise, the Ninth Circuit has held that only courts of appeal have the ability to review the validity of FCC rulings—and that, in order to do so, an aggrieved party *must* file an original petition for review in a court of appeals. US W. Commc'ns, Inc. v. Hamilton, 224 F.3d 1049, 1054 (9th Cir. 2000). Specifically, the Ninth Circuit stated:

> The Hobbs Act, 28 U.S.C. § 2342, gives the federal courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." Id. Section 402(a), in turn, encompasses "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under [the Communications Act of 1934, as amended by the Telecommunications Act of 1996]," with exceptions not relevant here. Together, these two statutes "vest the courts of appeals with exclusive jurisdiction to review the validity of FCC rulings." Wilson v. A.H. Belo Corp., 87 F.3d 393, 396–97 (9th Cir.1996). Aggrieved parties may invoke this exclusive jurisdiction "only by filing a petition for review of the FCC's final order in a court of appeals naming the United States as a party." MFS Intelenet, 193 F.3d at 1120; see also 28 U.S.C. §§ 2342, 2344.

US W. Commc'ns, Inc., 224 F.3d at 1054 (ellipsis in original).[11]

Not surprisingly, SHAC nowhere discusses the Hobbs Act in its Motion, instead saying simply—and incorrectly—that the FCC's rules are "not binding on this Court." (SHAC's Mot. at 7:23.) SHAC

[11] Essentially, what SHAC is trying to do is collaterally attack the FCC's 2003, 2008, and 2012 rulings defining an ATDS. Again, the only way in which an FCC ruling under the TCPA can be challenged is through the court of appeal. And, under the Hobbs Act, any such appeal can only be brought in an original proceeding before the court of appeal naming the United States as a party within sixty days that the challenged FCC order becomes final. See, e.g., US W. Commc'ns v. MFS Intelnet, Inc., 193 F.3d 1112, 1120 (9th Cir. 1999) (explaining that "[t]he Hobbs Act grants exclusive jurisdiction to courts of appeals to determine the validity of all final orders of the FCC," that "[a]n aggrieved party may invoke this jurisdiction *only* by filing a petition for review of the FCC's final order in a court of appeals naming the United States as a party," and that, as a result, "[t]he FCC order is not subject to collateral attack in this proceeding") (emphasis supplied); Leckler v. Cashcall, Inc., 2008 WL 5000528 at *2 (N.D. Cal. Nov. 21, 2008) (stating same in a TCPA action). See also 28 U.S.C. § 2344 (stating that aggrieved parties have "60 days after [the] entry [of a final order to] file a petition to review the order in the court of appeals"). The time for SHAC to raise the arguments in its Motion for Summary Judgment has long since passed. It is improper for SHAC to collaterally attack the 2003, 2008, and 2012 orders in this district-court proceeding.

has no basis to make that blanket statement. Indeed, neither Satterfield nor the two cases on which SHAC relies on making its Satterfield argument—Marks v. Crunch San Diego, 55 F. Supp. 3d 1288 (S.D. Cal. 2014), and Dominguez v. Yahoo! Inc., 8 F. Supp. 3d 637 (E.D. Pa. Mar. 20, 2014)—even mention the Hobbs Act. Under the Hobbs Act, this Court must follow the FCC rulings expanding the definition of ATDS, even if it appears to conflict with the Ninth Circuit precedent in Satterfield.

### 3. Satterfield Is Not on Point, and This Court Has No Jurisdiction to Ignore the FCC's Rulings Expanding the Definition of an ATDS.

Notwithstanding the Hobbs Act—and the language within the TCPA explicitly conferring upon the FCC authority to prescribe regulations implementing the requirements of subsection 227(b)—SHAC contends that the term "ATDS" cannot be construed to include a system which can send texts from a call list. In its Motion, SHAC states, "Plaintiff's entire case is based on nonbinding commentary by the [FCC]." (SHAC's Mot. at 7:11–12.) Instead, SHAC argues, "Satterfield, which is controlling Ninth Circuit precedent, instructs that because the statutory definition of ATDS is 'clear and unambiguous, deference to FCC guidance . . . would be inappropriate." (SHAC's Mot. at 7:23–26.) In other words, SHAC argues that this Court should ignore the FCC's orders broadening the definition of ATDS because the Court's analysis "begins" and "ends with the statutory text." (SHAC's Mot. at 7:23–8:2 (citing Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 951, 953 (9th Cir. 2009)).)

SHAC's reliance on Satterfield is misplaced and SHAC uses the Ninth Circuit ruling as a red herring in its Motion. In Satterfield, the plaintiff, a consumer, filed a class action against two defendants, a publisher and third-party marketer, claiming a violation of the TCPA arising out of an unwanted marketing text message. Satterfield, 569 F.3d at 949–50. The district court granted the defendants' motion for summary judgment, which had argued that the system used to send out the text message was not an ATDS, that the text message did not constitute a "call" within the TCPA, and that the plaintiff had consented to receive the text message. Id. at 948–49. The Ninth Circuit reversed, holding that there were genuine issues of material fact as to whether the defendants' system constituted an ATDS. Id. at 949. In reviewing the ruling with respect to the ATDS issue, the Ninth Circuit found that the district court had incorrectly focused on whether the defendants' system *actually* performed certain functions when the district court should have focused on whether the system had the *capacity* to

perform them. Id. at 950–51 ("When evaluating the issue of whether equipment is an ATDS, the statute's clear language mandates that the focus must be on whether the equipment has the *capacity* 'to store or produce telephone numbers to be called, using a random or sequential number generator.' Accordingly, a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it."). In other words, the Ninth Circuit in Satterfield was addressing the entirely separate issue of *actual* use versus *capacity*. That issue is not in dispute in the present case, as both SHAC and Plaintiff appear to agree that it is *capacity* that is important, not how CallFire's system was *actually* used by SHAC. Moreover, both the FCC and the text of the TCPA itself are in agreement that it is capacity that matters, not actual use.

But putting that to the side, the problem with relying on Satterfield and its progeny is that none of those decisions take into account the Hobbs Act. Neither Satterfield, Marks, nor Dominguez addresses the fundamental question of which "precedent" a district court required to follow: appellate-court rulings, under general principles of *stare decisis*, or the FCC's interpretative rulings, under the Hobbs Act? Confronted with *exactly* this argument, a Central District of California court recently decided that a district court is bound to follow the FCC's interpretative rulings. Hernandez v. Collection Bureau of Am., Ltd., 2014 WL 4922379 (C.D. Cal. Apr. 16, 2014).

In Hernandez, the defendant filed a motion for summary judgment alleging that the system used to call the plaintiff was not an ATDS. Id. at *1. As in this case, the defendant argued that the district court should ignore the FCC's clarification on what constitutes an ATDS, and instead follow the Ninth Circuit's holding in Satterfield. Id. at *3. The Hernandez court appropriately denied the defendant's motion, holding:

> In support of its position that the [system used by the defendant] is not an automatic telephone dialing system, [the defendant] argues that the FCC's clarification of what constitutes an automatic telephone dialing system under the TCPA is not entitled to any deference. [The defendant] argues that in 2009, the Ninth Circuit held in Satterfield v. Simon & Schuster that the language in the TCPA defining an automated telephone dialing system was "clear and unambiguous." Therefore, to defer to the FCC's interpretation of the term would "improperly re-define the TCPA's prohibitions—

> and the FCC's authority—beyond the plain meaning of the statute. (Id. at 3 (citing Chevron U .S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43, 104 S. Ct. 2778, 81 L.Ed.2d 694 (1984).)
>
> The Court lacks *jurisdiction* to entertain [the defendant]'s challenge to the validity of the FCC's rule. Under the Administrative Orders Review Act, known more informally as the Hobbs Act, the Court of Appeals is vested with "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1). With some exceptions not relevant here, section 402 includes "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under [the Communications Act of 1934, as amended by the Telecommunications Act of 1996]." Taken together, these two statutes *divest this Court of any authority* to rule on the validity or invalidity of the FCC's 2003 Order. Indeed, for the Court to agree, or even disagree, with [the defendant]'s argument would be to violate the Hobbs Act. See Wilson v. A.H. Belo Corp., 87 F.3d 393, 399–400 (9th Cir. 1996) (noting that asking a district court to agree or disagree with an FCC ruling invokes the Hobbs Act's *jurisdictional* bar). Rather, the Court is simply bound to apply the FCC's rulings.

Hernandez, 2014 WL 4922379 at *3 (internal citations and references omitted) (emphasis supplied). Likewise faced with the same argument, the Northern District of Illinois recently arrived at the same conclusion:

> I agree with [the defendant] that the FCC's interpretation on this point conflicts with the statutory requirement that an ATDS have the capacity "to store or produce telephone numbers to be called, *using a random or sequential number generator* [.]" 47 U.S.C. § 227(a)(1) (emphasis added). And if tasked with applying only the statute's language, I would conclude that [the defendant's] system does not constitute an ATDS because the [the defendant's] service does not use a random or sequential number generator. *Nevertheless, the TCPA and Hobbs Act bind me to the FCC's interpretation.*

> See 47 U.S.C. § 227(b)(2); 28 U.S.C. § 2342(1).
>
> In Satterfield v. Simon & Schuster, the Ninth Circuit characterized the TCPA's definition of ATDS as "clear." 569 F.3d 946, 951 (9th Cir.2009). On that basis, [the defendant] argues that I should apply Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and adhere to the statute's plain language (at the expense of the FCC's interpretation). *However, the Satterfield court did not consider whether the Hobbs Act required the district court to adopt the FCC's interpretation of the statute [in the first place]. For that reason, I decline to follow it* and instead follow the Seventh Circuit's CE Design decision, in which the court recognized that "a district court may [not] proceed through step one of the Chevron analysis without rubbing up against the Hobbs Act's jurisdictional bar." See CE Design, 606 F.3d at 449.

Johnson v. Yahoo!, Inc., 2014 WL 7005102 at *3 (N.D. Ill. Dec. 11, 2014) (emphasis supplied).

To the extent, then, that SHAC's gloss on Satterfield is correct—which it is not—the issue presented to this Court is one of precedent (Satterfield) versus jurisdiction (the Hobbs Act). And jurisdiction, which concerns the underlying question of whether a court has the power to issue a ruling in the first place (any ruling at all), trumps precedent, which concerns the secondary question of which line of cases a court with jurisdiction must follow. See US W. Commc'ns, 193 F.3d at 1120 (explaining that "[t]he Hobbs Act grants exclusive *jurisdiction* to courts of appeals to determine the validity of all final orders of the FCC," that "[a]n aggrieved party may invoke this *jurisdiction* only by filing a petition for review of the FCC's final order in a court of appeals naming the United States as a party," and that, as a result, "[t]he FCC order is not subject to collateral attack in this proceeding") (emphasis supplied). Cf., e.g., Santos v. Wells Fargo Bank, N.A., 2013 WL 1339585 (S.D. Cal. Apr. 3, 2013) (explaining that, "[b]ecause this issue is *jurisdictional*, the [c]ourt is required to address it first, before considering the merits of the case") (emphasis supplied).

Accordingly, under the Hobbs Act, district courts have no jurisdiction to ignore rulings from the FCC in any matter for which the FCC has been conferred the authority to issue such rulings. The TCPA expressly confers authority on the FCC to issue interpretative rules; consequently, district courts must follow what the FCC has said when it comes to interpreting the TCPA. Again, the FCC has issued

several rulings that expand the statutory definition of ATDS to include any equipment with the capacity to automatically dial numbers at random, in sequential order, or from a database of numbers, and this Court must apply those expanded definitions. Even the Glauser case relied on by SHAC arrived at the same conclusion as the Hernandez court when confronted with this issue. Glauser, 2015 WL 475111 at *5 ("While the TCPA's language does appear to support defendant's argument, in the years since the statute's passage in 1991, the FCC has issued regulations that expand the statutory definition, and under the Hobbs Act, the court is bound by those FCC rulings. See 28 U.S.C. § 2342(1).").

In any event, even if this Court were to look past the Hobbs Act by only applying Satterfield, that case is not the precedent that SHAC makes it out to be, at least for the issue at bar in its Motion. As noted above, and as explained in Hernandez, the Ninth Circuit in Satterfield was looking only at the separate issue of capacity versus actual use—an issue that is not raised by SHAC's Motion:

> Despite [the defendant]'s citation to Satterfield, there is in fact no Ninth Circuit authority that controls the outcome of this case. In Satterfield, the court held that in evaluating whether dialing equipment is an automatic telephone dialing system, the statutory language clearly and unambiguously requires only that the equipment have the capacity to store or produce telephone numbers to be called, not that it actually does so. Satterfield, 569 F.3d at 951. Because the district court looked to the equipment's actual function, rather than its capacity, the Satterfield court held that it had erroneously granted summary judgment. Id. *That outcome, however, did not require any evaluation of the validity of the FCC's 2003 Order, and certainly did not explicitly provide that in issuing the 2003 Order, the FCC overstepped its interpretive authority*.

Hernandez, 2014 WL 4922379 at *3 n.3. (emphasis supplied). As a result, even if Satterfield somehow trumped the Hobbs Act, its precise holding is inapposite. Therefore, in ruling on whether CallFire's system constitutes an ATDS, this Court must use the FCC's interpretation that an ATDS is a system that has the ability to store or dial numbers from a database of numbers.[12]

---

[12] Of course, the Hobbs Act does not divest district courts from determining whether SHAC has violated the FCC rules. See CE Design, Ltd. v. Prism Business Media, Inc., 606 F.3d 443, 446 n.3 (7th Cir. 2010) ("Although the Hobbs Act prevents the district court from considering the validity of final FCC orders, the court retains jurisdiction to determine whether the parties' actions violate FCC rules.").

### C. SHAC's Motion for Summary Judgment Should Be Denied Because Plaintiff's Text Message Was Sent Without the Requisite Human Intervention.

There is no dispute that CallFire's system—the system utilized by SHAC to transmit Plaintiff's text message—has the capacity to store and dial telephone numbers from a calling list.[13] In fact, CallFire acknowledged that its "subscribers have the ability to store the telephone numbers they input into their accounts for their later use." (Zelenski Decl. Ex. 3 [CallFire's Supplemental Resps. to Pl. John Luna's First Set of Interrogs.] at 10:20–22.) CallFire also testified that, after uploading and storing the telephone numbers, SHAC either could transmit its messages in real time by composing them and then immediately hitting "send," or SHAC could have CallFire's system "automate the process" by prescheduling messages to be transmitted "[a]t some future date" and time, "[w]ithout any further action needing to be taken by [SHAC]" itself. Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 183:16–18, 186:5–188:14, Ex. 28.) SHAC does not dispute the above capabilities in its Motion.

SHAC does argue, however, that it is entitled to summary judgment "because the text message at issue was sent only through *human intervention*."[14] (SHAC's Mot. at 9:1–3) (emphasis supplied). SHAC alleges that there was human intervention in "multiple stages of the text message transmission process" because someone at SHAC uploaded the telephone numbers and hit send. (SHAC's Mot. at 10:19–11:21.) In support of this argument, SHAC cites only to two district court opinions —Glauser and McKenna v. WhisperText, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015)—both of which ruled that the act of uploading customer telephone numbers to a database constitutes human intervention. However, because these two district-court opinions effectively eviscerate the FCC of its power to interpret the TCPA, they should be disregarded. As set forth in the FCC's 2008 order, the FCC held that

---

[13] The only dispute is SHAC's contention that storing or dialing telephone numbers from a calling list does not constitute an ATDS under the TCPA.

[14] SHAC argues that it is entitled to summary judgment because "human intervention" was involved in storing or dialing the telephone numbers. SHAC makes this argument even though "human intervention" nowhere appears within the TCPA's definition of an ATDS. Rather, it was the FCC who "interpreted an ATDS to 'cover any equipment that has the specified capacity to generate numbers and dial them without human intervention, regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.' See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02–278, Report and Order, 18 FCC Rcd. 14014, 14092 (2003) ("2003 TCPA Order") (emphasis added)." Sherman v. Yahoo! Inc., 997 F. Supp. 2d 1129, 1135 (S.D. Cal. 2014).

automated dialing from a preprogrammed list qualifies as an ATDS. Request of ACA International for Clarification and Declaratory Ruling, In the Matter of Rules and Regulations Implementing the TCPA of 1991, 23 FCC Rcd. at 563 n.23. According to the FCC, such a system works by having a "telemarketer[] *program the numbers to be called into the equipment*." Id. (emphasis supplied). In other words, in order to work, a telemarketer must program numbers into the database as a first step. However, under the recent Northern District holdings in Glauser and McKenna, that first step would automatically disqualify *any* such system because that step of programming constitutes human intervention. Those holdings, then, create a collateral-attack end-run around the Hobbs Act, and they must be ignored.

As explained by the FCC in its 2008 Order, in order for a preprogrammed list of numbers to exist in the first place, someone has to have uploaded the numbers into the system. If the test simply looked at whether someone programmed or curated the numbers in the first place—which is exactly what SHAC is arguing here—then an ATDS would never exist. Under the Hobbs Act, then, the line for human intervention necessarily must be drawn somewhere else. Given the name itself of "automatic telephone dialing system," Plaintiff submits that this line, of course, should be drawn based on whether the system can *automatically dial numbers* without requiring some person manually hitting "send" whenever a bulk message is to be transmitted.[15] There is ample evidence in the record demonstrating that the system SHAC used has precisely this *capacity*.[16] (See Zelenski Decl. Ex. 1 [Dep. Tr. of Jagannathan Thinakaran] at 188:21–189:18, 191:1–3, 198:23–199:7, 199:14–200:8, 201:5–13, 202:10–203:8, 204:5–205:18, 206:1–207:1, 207:23–208:4, 209:7–13.)

Regardless, Glauser and McKenna are not the final word on the issue. In fact, numerous district-

[15] In this regard, SHAC seems to suggest that labeling CallFire's system an ATDS would open the floodgates to liability for anyone who sends text messages using a cellular telephone. (See SHAC's Mot. at 6 n.3.) The central difference that SHAC ignores is that cellular telephones do not have the capacity to preschedule the transmission of recurring messages on a future, automated basis. The typical person's iPhone, for example, works purely in real time, with the message being sent as soon as someone hits "send." A user of CallFire's system, in contrast, can arrange for thousands of messages to be delivered months in advance without ever having to log back into the system. Indeed, as explained above, that user can even add new recipients to the contact list after setting a recurring schedule, and the messages will automatically be delivered to them at the pre-set times.

[16] As discussed in Satterfield, it is capacity—as opposed to actual use—that matters when determining whether a system qualifies as an ATDS.

court opinions that have ruled to the contrary. In Moore v. Dish Network, L.L.C., 2014 WL 5305960 at *13 (N.D. W. Va. Oct. 15, 2014), for example, the court held that, even though there was human involvement in the process of creating call lists to be uploaded into the software, the defendant's system still constituted an ATDS. Similarly, in Davis v. Diversified Consultants, Inc., 36 F. Supp. 3d 217, 226 (D. Mass. 2014), the district court held that the defendant's system was an ATDS even though it dials from a list of numbers. In Sterk v. Path, Inc., 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014), the district court found that the defendant's system was an ATDS despite the fact that the user of the defendant's service made their contact information available to the defendant. In addition, the Sterk court aptly pointed out that uploading contact information was "essentially the same as when a call list is entered by a telemarketer in a database," and expounded, "[t]he undisputed facts show that the equipment used by [the defendant], which makes calls from a stored list without human intervention is comparable to the predictive dialers that have been found by the FCC to constitute an ATDS . . . . It is the ultimate calling from the list by the automated equipment that is the violation of the TCPA." Id. Likewise, in Griffith v. Consumer Portfolio Serv., Inc., 838 F. Supp. 2d 723 (N.D. Ill. 2011), the district court explained:

> The FCC concluded that predictive dialers are governed by the TCPA because, like earlier autodialers, they have the capacity to dial numbers "without human intervention." In doing so, it interpreted "automatic telephone dialing system" to include equipment that utilizes lists or databases of known, nonrandom telephone numbers. That is precisely how [the defendant's] equipment operates: the dialer automatically dials numbers stored in the Logical View File and routes answered calls to available collectors. Even assuming that [the defendant's] equipment can only function in this way, and cannot generate and dial random or sequential numbers [], it is still an "automatic telephone dialing system." . . . []Indeed, the FCC plainly intended to prevent companies from circumventing the statute in this fashion. In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. at 14092–93. Plaintiffs ask us both to deny [the defendant's] motion and to hold for plaintiffs as a matter of law on the same issue. [] We will grant the request. For the reasons we have just explained, we conclude as a matter of law that [the defendant] employs an

"automatic telephone dialing system" to call its customers.

Griffith, 838 F. Supp. 2d at 727 (N.D. Ill. 2011). Accordingly, this Court can only come to the conclusion that, although SHAC may have uploaded its contacts into CallFire's system, that does not constitute human intervention within the meaning of an ATDS. To rule otherwise would be tantamount to ignoring the FCC's 2008 ruling, which held that the act of programming numbers is inherent first step for any ATDS operating off a list of preprogrammed numbers. Request of ACA International for Clarification and Declaratory Ruling, In the Matter of Rules and Regulations Implementing the TCPA of 1991, 23 FCC Rcd. at 563 n.23. For the same jurisdictional reason, then, that SHAC's Satterfield-based argument fails, its argument concerning the contours of human intervention also fails.

## IV. CONCLUSION

Defendant's Motion should be denied. As set forth above, the Hobbs Act divests district courts from ruling on the validity of FCC rulings since only the courts of appeals have that exclusive jurisdiction. As a result, the Hobbs Act requires this Court to apply the binding FCC rulings issued in 2003, 2008, and 2012—all of which work together to expand the definition of an ATDS to include not only storing and dialing telephone numbers from a random or sequential generator, but also from a preprogrammed database of numbers. As correctly decided in Hernandez and Johnson—when faced with the jurisdictional issue whether to apply Satterfield over the FCC rulings—the Hobbs Act clearly requires that the FCC rulings be applied over the Ninth Circuit "precedent." Regardless, Satterfield's holding is inapposite because it addresses capacity versus actual use.

This Court should likewise ignore Glauser and McKenna with respect to their rulings addressing what constitutes human intervention. Were the Court to follow these two district-court opinions, it would be tantamount to ruling that there can never be an ATDS when numbers are dialed from a preprogrammed list. Whenever there is a preprogrammed database of numbers, there must necessarily be a human programming those numbers in the first place. The 2008 FCC ruling reasoned as much, expressly stating that, when a telemarketer programs numbers to be called into equipment, that is still considered an ATDS. As with SHAC's Satterfield argument, the Hobbs Act again requires that the FCC ruling be followed over the two district-court opinions. At the very least, reasonable triers of fact could disagree whether the system used by SHAC constitutes an ATDS, as evidenced by district-court judges

themselves reaching the opposite conclusion that Glauser and McKenna reached. SHAC's Motion for Summary Judgment therefore should be denied.

Dated: June 1, 2015

JAURIGUE LAW GOUP

/s/ *Abigail Zelenski*
Michael J. Jaurigue
Abigail A. Zelenski
David Zelenski
*Attorneys for Plaintiff John Luna*